**MATHEWS CONVEYOR CO. v. PALMER BEE CO.**

No. 927.

District Court, E. D. Michigan, S. D.

Oct. 15, 1941.

Harold Olsen, of Chicago, Ill. (Whittemore, Hulbert & Belknap, of Detroit, Mich., of counsel), for plaintiff.

Bodman, Longley, Bogle, Middleton & Farley, of Detroit, Mich., for defendant.

LEDERLE, District Judge.

1. Plaintiff, Mathews Conveyor Company, is a Pennsylvania Corporation. Defendant, Palmer-Bee Company, is a Michigan Corporation.

2. For convenience and clarity, this litigation, based on a lengthy and complicated complaint, will be considered under four divisions, viz.:

A. An accounting for profits derived from a sale made by the defendant at the time the plaintiff claims the defendant was acting as its agent. The amount involved in this controversy exceeds the sum of three thousand ($3,000) dollars, exclusive of interest and costs. Jurisdiction is based upon diversity of citizenship.

B. Unfair competition. The amount involved in this controversy exceeds the sum of three thousand ($3,000) dollars, exclusive of interest and costs, and jurisdiction is based upon diversity of citizenship.

C. Copyright infringement of portions of two of the plaintiff's catalogs.

D. Infringement of the following United States patents:

1,720,255, issued to Charles A. Adams, July 9, 1929.

1,876,534, issued to Charles A. Adams, September 13, 1932.

2,023,718, issued to Charles A. Adams, December 10, 1935.

2,077,188, issued to H. M. Rishel, April 13, 1937.

Throughout the trial, for convenience, these patents were referred to as the "255 patent", "534 patent", "718 patent", and the "188 patent".

3. The defendant filed a motion for a summary judgment in accordance with the provisions of Rule 56 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. After an extended hearing, this motion was overruled.

4. In accordance with the custom in force in this court for some time, both parties were asked to prepare and file proposed findings prior to the pre-trial hearing, as provided for in Rule 16 of the Rules of Civil Procedure. Both parties complied with this request, and at the pre-trial hearing, the parties reached an agreement and a formal order was entered providing that at the time of the trial no further proof need be taken as to the agreed facts.

Findings 5 to 49, both inclusive, are based directly upon this pre-trial order, dated October 23, 1939.

5. Plaintiff, Mathews Conveyor Company, is a manufacturer of conveyor equipment of the type known as "Gravity Roller Conveyors", such as are widely used in industrial plants for conveying articles from one place to another.

6. Plaintiff's predecessor in business, Mathews Gravity Carrier Company, engaged in the manufacture of Gravity Roller Conveyors as early as 1905.

7. Defendant, Palmer-Bee Company, is a manufacturer and jobber of elevating and power transmitting machinery, mill supplies, and structural steel.

8. Defendant, as early as 1915, and continuing up to the present time, has sold, distributed and installed plaintiff's products.

9. On or about May 1, 1920, the plaintiff and defendant entered into an oral contract, the terms of which were later reduced to writing in a letter dated May 4,

404

1920, written by the defendant company by its president and general manager, William E. Bee.

10. The letter referred to in Finding No. 9, reads as follows:

"May 4, 1920.
"Mathews Gravity Carrier Co.,
"Ellwood City, Penn.

"Gentlemen:

"Confirming conversation and verbal agreement entered into at your office April 30th, wherein it was understood and agreed that you appoint Palmer-Bee Co., Detroit, Mich. as your exclusive sales agents and representatives for the State of Michigan, (Upper Peninsula not included) for the complete sales of your products; you to furnish catalogs and other printed matter bearing our imprint, that will fully describe and be of assistance in the promotion of sales of your products.

"You are also to furnish each of our salesmen engineering data sheets as pertains to your products and render such engineering assistance as you may be called upon from time to time.

"Prices of your products to us are subject to changes of market conditions, but at no time are they to exceed the lowest net cost to any of your other agents.

"You are also to protect us on quotations of record in our office by increased cost or ample notification for withdrawal of quotation.

"In consideration of the above, the Palmer-Bee Company agree to devote their best efforts to the sale of your products, keeping you fully advised as to the progress of our Sales Dept. on the more important prospects. Also, to render to you, if you desire it, a monthly statement of sales, giving you the name of purchaser, location and list of materials purchased.

"We also agree not to sell any other make of Gravity Conveyor.

"Prices are subject to market conditions as above outlined. Terms of payment— Thirty days net, 2% cash discount, payable tenth of month following purchase.

"This agreement may be cancelled by either party on sixty, (60) days notice in writing.

"Yours very truly,
"Palmer-Bee Company
"(Signed) Wm. E. Bee
"President & Manager
"_____
"_____."

11. Acting under this understanding, the Mathews Company did supply defendant with advertising material, some of which listed the Palmer-Bee Company by name under the heading, "Branch Offices and Representatives", and some of which merely contained a list of cities under the name of the Mathews Company. On the latter a Palmer-Bee Company sticker was affixed either by plaintiff or defendant.

12. During the years from 1920 until September, 1937, when plaintiff cancelled the agreement, the defendant sold over one million dollars worth of plaintiff's products.

13. During the existence of the so-called agreement referred to in Finding Nos. 9 and 10, the Palmer-Bee Company dealt directly with its customers in securing orders and delivering and installing the Mathews products. It issued its purchase order to the Mathews Company, specifying the goods and the price to be paid therefor. If the goods were to be shipped to the customers, rather than the Palmer-Bee Company, Palmer-Bee Company tags, packing lists, and bills of lading were used. The goods so ordered were invoiced by the Mathews Company to the Palmer-Bee Company, f. o. b. Ellwood City, Pennsylvania, and the Palmer-Bee Company paid the Mathews Company direct. Palmer-Bee Company, in turn, billed the customer directly in its own name for the goods, assumed the credit risk for payment, obtained full title upon the shipment by the Mathews Company, and exercised complete control over the goods, including all liability incident to the installation and erection thereof.

14. During the period, May 1, 1920, to September 1, 1937, the defendant received from the plaintiff a commission upon all sales it made of the plaintiff's products.

15. During the period, May 1, 1920, to September 1, 1937, the defendant sold plaintiff's products at prices established by plaintiff and departed from such prices only upon approval by the plaintiff at the defendant's request.

16. During the period, May 1, 1920, to September 1, 1937, defendant held itself out to the public as the representative or jobber of the plaintiff in the State of Michigan.

17. During the period, May 1, 1920, to September 1, 1937, the defendant was engaged in its own behalf in procuring business for the plaintiff's products.

18. From about 1924 to this date, the defendant has distributed to the trade and is still distributing to the trade a catalog known as Catalog No. 40, which upon pages 555 to 566, inclusive, illustrates and describes the products of the plaintiff under the plaintiff's name. In this catalog defendant announced to the public on pages 4 and 5 that it conducts an extensive jobbing business and under the heading "As Jobbers" lists the name of the plaintiff along with twenty-seven other manufacturers. The catalog, in addition to illustrating and describing the plaintiff's products under the plaintiff's name, similarly illustrates and describes the products of the twenty-seven other manufacturers and all the products of the defendant's own manufacture.

19. From December, 1927, to and including June, 1937, the name of the plaintiff appeared in the Detroit telephone directories under the same address and with the same telephone number as the defendant.

20. It was well known to the trade and the purchasing public during the period May 1, 1920, to September 1, 1937, that the defendant represented the plaintiff in the State of Michigan and the trade and purchasing public ordered plaintiff's products from the defendant, sometimes addressing such orders to the plaintiff at the defendant's address and at other times addressing such orders directly to the defendant.

21. In 1937 defendant learned that the Chevrolet Division of the General Motors Corporation was to build a new plant at Tonawanda, New York, which would require several large installations of different types of conveyors, including gravity roller conveyors. The Palmer-Bee Company made an engineering survey of this proposed installation, and submitted a proposal for the furnishing and erection of a large part of the gravity roller conveyor, and ancillary equipment, particularly specifying Mathews equipment as to the major portion thereof.

22. The General Motors Corporation, through its Chevrolet Division, accepted the defendant's proposal and issued its purchase order to the defendant, Palmer-Bee Company, copying the latter proposal verbatim, including the specifications for Mathews equipment.

23. After the receipt of Chevrolet's purchase order, defendant's president, George A. Bee, visited the plant superintendent of Chevrolet at Tonawanda on August 11, 1937, and made a counter-proposal to fill the order for roller conveyors specified as Mathews in the purchase order with the goods of the defendant's manufacture. The Plant Superintendent agreed to accept this counter-proposal and the order was filled with goods of defendant's manufacture, after the cancellation of the agreement by the plaintiff.

24. The Chevrolet order for Mathews equipment was obtained by the defendant without competition and because of Chevrolet's satisfaction with similar equipment of the plaintiff sold and installed by the defendant in the Chevrolet plant at Flint, Michigan.

25. In submitting its proposal to the Chevrolet Company to supply the equipment subsequently ordered by Chevrolet, the defendant wrote a letter to the Chevrolet Company dated July 6, 1937, in which the following statement is made: "All material as listed duplicates the design and construction similar to that which has been furnished by us in the past to the Flint plant. If favored with your valued order, we are in a position to assure you that the equipment in question will exactly duplicate that previously furnished by us."

26. Since the termination of the agreement referred to in Finding No. 9 the defendant has engaged in the general manufacture of roller bearings, including ball bearings which are an essential part of such equipment and has adopted the use of symbols 530, 570 and 630 to designate the bearings of similar capacity to the bearings of the plaintiff's manufacture designated by the latter by the symbols 53, 57, and 63. The defendant has also adopted the letters A, B, S and SB to designate bearings having certain general types of seals, which letters had previously been used by plaintiff to designate bearings having seals of the same respective types.

27. In the conduct of its business the defendant had photographs made of installations made by it which included conveyor equipment manufactured by plaintiff and during the period from May, 1920, until September, 1937, both plaintiff and defendant used photographs so made in their advertising literature and defendant in two publications published by it since September, 1937, has reproduced certain of these photographs.

28. Prior to September, 1937, plaintiff adopted and used and is still using the slogan, "The Continuous Flow Principle of Handling Materials", in much of its advertising, and sales literature; some of which was distributed by the defendant, and has the name and address of the defendant printed thereon.

29. Prior to September, 1937, the plaintiff affixed to the goods of its manufacture a decalcomania transfer upon which appeared the slogan, "The Continuous Flow Principle of Handling Materials", and such decalcomania transfers were affixed to some of the goods sold by the plaintiff to the defendant.

33. Plaintiff charges copyright infringement by the defendant alleging that of the 300 or more illustrations contained in Exhibit A defendant has copied five thereof in its catalog, Exhibits E and 6 thereof in its book Exhibit F entitled "Factory Products Installations in Pictures". The six illustrations in plaintiff's book complained of are tabulated below plaintiff's illustrations with the corresponding page of Exhibit A being given in the lefthand column; defendant's illustrations in Exhibit E in the central column and defendant's illustration in Exhibit F being given in the righthand column with corresponding pages:

| Exhibit A | Exhibit E | Exhibit F |
| --- | --- | --- |
| p. 8 photograph | p. 22 pen and ink drawing | p. 42 pen and ink drawing |
| p. 22 " | p. 25 pen and ink drawing | p. 42 pen and ink drawing |
| p. 26 pen and ink drawing with numerous inscriptions | p. 24 pen and ink drawing sans inscriptions | p. 42 pen and ink drawing sans inscriptions |
| p. 28 photograph | p. 24 pen and ink drawing | p. 42 pen and ink drawing |
| p. 34 " | p. 25 pen and ink drawing | p. 41 photograph |
| p. 118 " | | p. 42 pen and ink drawing |

30. Subsequent to September, 1937, the defendant had printed and distributed a one-page circular which contained, in part, the following: "The Palmer-Bee Company is now applying its straight line producing methods and continuous flow principle of materials handling to the manufacture of furniture, radios, textiles, tobaccos, etc." (Listing 61 different industries and industrial applications.)

31. In 1930 plaintiff published a catalog and obtained a book copyright registration therefor, which catalog contains 132 pages of text and over 300 illustrations, viz: drawings of conveyor units and parts thereof and photographic cuts of actual installations.

32. The title page of this catalog contains at the bottom thereof on one line in Roman Capitals "Mathews Conveyor Company, Ellwood City, Pa." Immediately below this line and separated therefrom by a space of a Roman Capital em quad appear in three equally spaced lines of nonpareil type the names of twenty-two cities of the United States, the last line of such three lines ending with "Mathews Conveyor Company, Ltd., Port Hope, Ont." then at the bottom center of the page spaced two nonpareil em quads below the third line is "Copyright 1930" also printed in nonpareil type.

34. In April, 1937 plaintiff secured a book copyright registration for a book, Exhibit C, entitled "Equipping The Steel Industry For Continuous Production" and containing 108 pages and also about 300 illustrations of the same type as in Exhibit A.

35. Plaintiff charges copyright infringement of said book by the defendant alleging that defendant has copied on pages 28, 29, 31, 44, 46, 48, 50, 52, 54, 56, 58 and 60 the photographs of bearings appearing on page 10 of said book.

36. Page 10 of plaintiff's book, Exhibit C, contains six reproductions of photographs, five of which are shown in a vertical column and are those of bearings having a quadrant of about 90° cut out to show the interior construction and tilted towards the observer at an angle of about 15°, and the sixth being a showing of a cut-away roller.

37. In addition to the illustrations on page 10 of Exhibit C, this page also contains a description of the designations applied to the various kinds of seals.

38. Pages 28 and 29 of the defendant's catalog, Exhibit E, contain reproductions of pen and ink drawings of seven bearings also with an approximate 90° quadrant cut out to show the interior construction. Six of the showings on the two

pages of defendant's catalog appear in a horizontal line extending across both of the pages 28 and 29 and bear the following designations thereunder:

Flanged Type "F"

Straight Type

Type "A" Felt Outer Seal No Inner Seal

Type "B" Felt Outer Seal Steel Inner Seal

Type "S" Steel Outer Seal No Inner Seal

Type "SB" Steel Outer Seal Steel Inner Seal

while the seventh showing appears at the lower lefthand corner of page 29 and has the following designation:

630-SB Steel Outer Seal Steel Inner Seal.

39. As far as the mechanical details of the structures of the bearings shown on page 10 of plaintiff's Exhibit C and pages 28 and 29 of defendant's Exhibit E are concerned, there are several differences between the bearings shown in defendant's book and those shown in plaintiff's book with the exception of the bearing designated "straight type" on page 28 of defendant's book which seems to correspond in mechanical details to the bearing designated (1.) plain bearing on page 10 of plaintiff's book.

40. The bearing shown associated with the roller on page 10 of the plaintiff's book, Exhibit C, is of the same general type of construction as the bearing designated "Flanged Type" as shown on page 28 of defendant's book, but the showing in defendant's book depicts a much wider spacing of the bearing housing in the lefthand side from the ball races than the bearing shown in plaintiff's book. The same is also true with Type "S" and the Type "SB" bearing shown in the horizontal column on page 29 as compared with the similarly designated bearing on page 10 of plaintiff's book, Exhibit E. The B and two SB type bearings shown on page 29 of defendant's book are shown as provided on the righthand side thereof with steel inner seals while the similarly designated bearings on page 10 of plaintiff's book are provided with felt seals carried on an axially extending piece with projections from the righthand side of the bearing some distance from the bearing races. The Type A bearing shown on page 10 of the plaintiff's book, Exhibit C, is provided with an angular or "hat-shaped" steel ring at the inner end of the sealing chamber formed at the lefthand side of the ball race while in the showing of defendant's book of the Type A bearing, a plain flat steel washer is shown in the similar position. There is no showing on page 10 of Plaintiff's book of a bearing such as illustrated at the lefthand side of page 29 of defendant's book and designated 630-SB.

41. Page 31 of defendant's book contains a pen and ink drawing of an "Axle Mounting", having at the lefthand side thereof a cut-away bearing the mechanical details of which in all respects seem to agree with the showing of the Type A bearing appearing on page 10 of the plaintiff's book Exhibit C. This showing in defendant's book includes a hexagonal axle passing through the two bearings, the ends of the axle being provided with what is designated in defendant's catalog as "Patent washers". These showings on page 44, 46, 48, 50, 52, 54, 56 and 58 of defendant's book, Exhibit E, are but small fragmentary pen and ink showings of the lower part of the bearing illustrated in the horizontal column at the top of page 28 and 29 of this book.

42. Pages 76, 77, 78 and 79 of plaintiff's book, Exhibit C, contain showings of rollers associated with bearings similar to those shown on pages 58 to 71, inclusive, thereof. The mechanical details of the bearings shown on these pages being similar to the pen and ink drawings in the lower lefthand corner of page 29 of defendant's book, Exhibit E, of the bearings designated as 630-SB.

43. There is no showing in defendant's catalog of cutaway rollers such as shown on pages 76, 77, 78 or 79 of plaintiff's book.

44. The showing on page 8 of plaintiff's book, Exhibit A, is a reproduction of a photograph of what is known as a Straight Rail Section of a gravity roller conveyor, while the showing appearing on page 22 of defendant's book, Exhibit E, is a pen and ink drawing of a similar straight section of a conveyor rail. The rail section shown in plaintiff's book is provided with a slidable guard rail section adapted to engage the ends of rollers and lock the same in position. The side frame members of the conveyor section, as shown in plaintiff's book, are flat plates and the ends of the rollers shown in the photographic reproduction on page 8, are illustrated as round, whereas the conveyor section

shown on page 22 of defendant's book is not provided with the guard rail. The side frame members are shown as angle iron members and the ends of the roller axles are shown as hexagonal. The name Palmer-Bee is printed on the showing on page 22 of the defendant's book and no name appears on the showing on page 8 of the plaintiff's book.

45. The reproduction of the sheet A205-4-36 was also included in a publication of the Mathews Conveyor Company entitled "Industrial Conveyors" and "For Bottlers" published and distributed by the plaintiff, Mathews Conveyor Company, without notice of copyright thereon.

46. Showing of a roller spiral such as contained on page 22 of plaintiff's book, Exhibit A, appears on page A113-4-35 forming part of a publication entitled "Engineers and Manufacturers of Conveying Equipment For Bottlers". A similar showing is also contained in the publication, Exhibit S, attached to the affidavit of F. E. Moore, executed March 30, 1939, filed herein. Both of these are publications of the Mathews Conveyor Company containing no notice of copyright thereon.

47. Showing of a sheet metal spiral as contained on page 118 of plaintiff's book, Exhibit A, is contained on the second page of Exhibit Q entitled "A Natural Law of all Industry" attached to the affidavit of F. E. Moore, dated the 30th of March, 1939, and forming part of the papers filed in connection with the motion for preliminary injunction, this being a publication of the Mathews Conveyor Company containing no notice of copyright thereon. A similar showing appears on the publication Exhibit S also attached to and forming a part of the same affidavit.

48. With respect to the pen and ink drawing appearing at the bottom of page 29 of Exhibit E, alleging to be a copy of the photograph and drawings appearing at pages 76, 77, 78 and 79 of plaintiff's book, Exhibit C, a showing of the bearing designated SB appearing on said pages is contained on the last page of the pamphlet, Exhibit W, attached to and forming a part of the said Moore affidavit, which publication is entitled "Shock Absorbing Roller Conveyors" published and distributed by the plaintiff, Mathews Conveyor Company and containing no notice of copyright thereon.

49. Prior to the publication by the defendant of its books, Exhibit E and F, the defendant requested of the plaintiff and received from it large quantities of plaintiff's copyrighted books, Exhibits A and C.

50. Prior to 1937 the relations between the president of the plaintiff company and the president of the defendant company were very friendly and both companies profited by their mutual cooperation. Prior to 1920 the defendant marketed the plaintiff's products and has continued to do so up to this date. From May 4, 1920, to August 14, 1937, the defendant company did not act on behalf of the plaintiff company and was not subject to its control. During this period the defendant company promoted the sale of the plaintiff's products, and when it secured an order purchased the plaintiff's products, and the title thereto passed to the defendant at the date of shipment. The defendant company handled the plaintiff's products in substantially the same manner that it handled products of other manufacturers and vendors.

The plaintiff fixed the price at which its products were to be sold to the consumer and the defendant at all times respected the plaintiff's request that no deviation from these prices be made without the consent of the plaintiff. An adjustment of the price charged to the Palmer-Bee Company in cases where the products were sold for less than the quoted price was made by the plaintiff.

51. When the friendly relationship between the Mathews and the Palmer-Bee Company ended in 1937, the Palmer-Bee Company set out to vigorously promote the sale of its products in competition with the products of the Mathews Company. This it had the right to do, so long as it did not invade the Mathews Company patent rights. It had a right to adopt any method it chose to identify its products, unless the marks adopted would be likely to mislead an ordinary purchaser, buying with ordinary caution, into believing that the goods were of Mathews manufacture.

The numerals adopted by the Palmer-Bee Company distinguished its goods from the Mathews goods, and this was the obvious intention of Palmer-Bee. The products of the Palmer-Bee company had been plainly advertised in its catalogs and by labels, as of their own manufacture, and their whole course of dealing, as shown by the evidence, has been such as to mislead no one into buying their products as those of the Mathews Company. The defendant has not palmed

off its goods, either directly or indirectly as the goods of the plaintiff, and has not attempted to do so.

52. The specification of the first patent in suit, No. 1,720,255, was that the alleged invention consists of an improvement, particularly upon the roller illustrated and described in the Buck patent, No. 1,445,-821, issued February 20, 1923. A comparison of Fig. 4 of the Buck patent, and Fig. 2 of the patent in suit, shows that the two structures are identical with respect to the insertion of head 8, and that the head 8 of these two patent disclosures consists of an annular sheet metal member, generally U-shaped in cross section, which is inserted between the ball-bearing cage and the end of the roller for supporting the latter, and that this sheet metal member, which is in both patents designated as "a head" comprises inner and outer circular webs connected by a transverse portion with the head opening out from the end of the roller.

53. During the prosecution of the application upon which the patent in suit was granted, the Patent Office Examiner rejected claims upon the Buck patent and after filing several amendments and further rejections by the Examiner, the claims of the patent in suit were finally allowed after an appeal to the Board of Appeals. In addition to the Buck patent, the Patent Office Examiner relied upon the patents to Wego, No. 1,425,561, and Lister, No. 1,351,481.

54. Specifications for the patent in suit state that the outer web 9, of the ball-bearing cage carrying head 8, "is provided with a circumferential depression or recess 16" and then goes on to state that the extreme end of the roller is depressed into the circumferential recess 16.

55. It appears from the file wrapper that the Board of Examiners of the Patent Office was impressed with the argument that the combination of the preformed recess 16, with the swaged-in end of the roller 21, and the outwardly flared wall 20, was new. At the time the Board considered this subject it had only the Buck, Wego and Lister patents before it and it found:

"The structure need not be specifically described as it is all present in the prior patent to Buck, except that the outer ends of the U-shaped web portion which supports the shell of the roll is bent downwardly to form an angular groove and the end of the shell is bent down into the groove and seated closely against the same. * * * it is not considered that the way employed by Appellant is necessarily an obvious one."

56. It appears that the Board of Examiners allowed the patent claims on the theory that it was novel to swage the end of a tubular roller into a recess adjacent to an outwardly projecting flange abutting against the end of the roller and thereby forming an interlock between the roller and the head, which would prevent movement of the head either inwardly or outwardly from the roller. All of this is shown in the patent to Hiler, No. 833,326, which patent discloses a head 8 provided with an annular recess 21, outwardly open in its outer surface, with an outwardly projecting annular flange or shoulder 22, for engagement with the end face of the roller, and for performing precisely the same function as the structure shown in the patent in suit.

The Hiler patent was not before either the Examiner or the Board of Appeals, and it fully discloses all of the features which were urged upon the Patent Office as constituting the only distinction between the disclosure of the patent in suit, and the Buck patent. The Hiler patent, therefore, shows that the alleged features of novelty upon which the grant of this patent in suit was predicated were not novel, but were fully and completely disclosed in the Hiler patent.

57. The step of swaging a tubular roller to provide an interlock between the roller and head is, in addition to being disclosed in the Hiler patent, also disclosed in the Pauly patent No. 537,066, the Dehler, No. 867,350, and the Younkman patent, No. 1,-243,375, and is shown thereby to be common practice. The record in this case clearly establishes that the structure defined in the claims in the patent in suit results from merely subjecting the end of the structure shown in the Buck patent to a swaging operation. Many years prior to the alleged invention, it was common practice to swage the end of tubes. If you insert the Buck structure in the end of a roller and subject the end of the roller to a swaging operation, you will simultaneously squeeze the end of the tube 7 inwardly and the outer web 9 of the head 8 inwardly. The structure shown in the Adams patent will inevitably result from such an operation. The suggestion of the specifications of the patent that the Buck structure be pre-formed to fit the end of the swaged roller required no exercise of inventive genius. No skilled mechanic would attempt to use the extra and totally

unnecessary operation described in the Adams patent of forming the recess in the adapter before inserting it in the end of the tube. This suggestion is a step backward in the art, not forward.

58. The second patent in suit, No. 1,876,534, is also for a bearing adapter for use in connection with tubular gravity carrier or conveyor rollers. The patent discloses an aperture or head, to be interposed between the bore of a tubular roller and a bearing cage, the head being constructed of two pressed steel members, one of which, termed the outer part, as best shown in Fig. 3 of the patent, comprises an outer cylindrical portion 10, having an annular shoulder 11, formed at one end thereof for the purpose of abutting against the edge of the tubular roller 2. This outer member, which the patent calls the head 9, has an inwardly turned flange 12 thereon, provided in the center thereof with an aperture designated in the patent as "an axial bore 13." The other member of the adapter designated by the reference character 20, is provided with a cup-shaped portion 14, adapted to fit snugly into the bore 13 of the head 9, and the member 20 has a transversely disposed web 17, which terminates in an annular flange 16. When the two parts are in assembled condition, a hollow box-like structure is formed between the outer and inner members in which the inwardly turned flange 12 of the head 9 and the outwardly turned flange or transversely disposed web 17 function to resist loads placed upon the roller 2. The structure disclosed in the patent is an example of the use of comparatively light steel pressings or stampings, associated in such a way as to form a substitute for solid metal parts, or to provide a more rigid adapter or head for gravity conveyor rollers than provided by the single sheet metal stamping, U-shaped in cross section, as disclosed in the first patent in suit or the Buck patent. The single piece adapter of the earlier Adams patent, the first patent in suit, and this patent, are designed, and intended, to perform exactly the same function, namely, to provide a means for filling up the space between the interior of a tubular gravity roller and an anti-friction cage in which the shaft of the roller is mounted. It was common practice in the art to construct bearing adapters for conveyor rollers of sheet metal stampings as shown in the following patents: Goldman, 914,714; Lister, 1,351,481; Jaenicke, 1,660,512; Beulke, 1,580,367; and Alvey, 1,141,515.

59. More than two years prior to the filing of the application for the patent in suit it was common practice to use telescoped, or nested sheet metal pressings or stampings to provide a plurality of spaced radial webs to carry radial loads. The use of such constructions had wide application in the manufacture of wheels for roller skates, examples of such constructions being shown in the following patents: Bryant, 1,330,579; Hoerle, 1,359,506; Pribil, 1,848,144. The use of the two-part bearing adapter for carrying a bearing cage in a tubular gravity conveyor roller is also shown in the Alvey patent, 1,141,515. Each of these four patents above mentioned disclose the combination of a pair of nested sheet metal stampings telescoped together to provide a pair of spaced radially extending webs or flanges through which radial loads are transmitted to the bearing cage and which webs perform the function of the webs of the structure shown in the patent in suit in precisely the same way.

The use of sheet metal stampings, as substitutes for solid one-piece adapters was common and well known long before the application was filed for this patent. Such differences as exist between the structure shown in the patent in suit and the prior art constructions are merely in details that represent the designer's choice of well-known mechanical expedients, well within the skill of any competent designer, and the result achieved would be reasonably anticipated by any mechanic skilled in the art. It did not require the exercise of inventive genius to create this structure.

60. The third patent in suit, No. 2,023,718, discloses a ball-bearing in which the inner race of integral construction was formed at one end thereof with an extension, the outer race of the bearing being a three-part member consisting of two opposed ball races 3, which, after the balls are assembled, are held together in operative position by the third section of the outer race consisting of a jacket 12 of relatively soft metal crimped about the two outer ball races 3 and provided at the same end of the bearing as the extention 8 of the inner race, with an inwardly turned flange 23, which flange as described in the patent "terminates in relatively close proximity to an annular member 9" fitted upon the extension 8 so that "there may be radial play more or less between the inner edge of the flange 23 and the annular member 9" the annular flange 23 is spaced axially from

a flange formed by the reduction of the extension 8 of the inner ball race so as to provide a chamber "adapted to receive a suitable sealing means or packing 24" which is shown and described as consisting of a felt ring or washer.

61. The file wrapper history of this patent shows that the application was repeatedly rejected by the Examiner on the cited art. Allowance of the patent was finally procured by an appeal to the Board of Appeals of the Patent Office. The only art which was relied upon by the Examiner and which was before the Board of Appeals, were the patents to Morehouse, No. 1,734,266, Hughes, No. 1,762,819, and Brown, No. 1,801,665. In appellant's brief on appeal it was pointed out that the bearing shown and claimed in the patent was not, and could not be, of the precision type because the expense thereof would be prohibitive. The record shows, however, that large numbers of bearings are made for roller conveyors in which the precision type of bearings are used. It was further argued that in the Brown and Hughes patents, upon which the Examiner principally relied for supporting his rejection, the sealing effect of the packing ring 64 of Brown, or the washer 70 of Hughes, was merely axial, whereas in the construction shown in the application and in the patent in suit, sealing of the bearing both axially and radially was effected to prevent the entrance of dirt, scale or other foreign matter into the bearing. It was also urged that the cited references did not disclose any means such as the jacket 12 of the Adams patent, for embracing the outer race member and having a portion overhanging adjacent ends of the race members to receive a seal, with the lower edge of said overhanging portions spaced from the end extension of the inner race member to permit a limited radial play between it and the end extension of the inner race member. In its decision reversing the Examiner, the Board of Appeals made specific reference to the embracing means overhanging the ends of the race members and with the overhanging stopping short of the extension so as to permit radial play, and the Board furthermore based its reversal of the Examiner on the argument that in the applicant's structure "it is necessary for the dust to travel both axially and radially in order to reach the ball bearing."

Defendant introduced in evidence the patent to Dull, No. 1,772,711, granted August 12, 1930, upon an application filed September 19, 1927, which shows a ball bearing for a conveyor roll and discloses (a) a structure in which the inner race is provided with an extension at one end thereof, (b) a three part outer race consisting of two similar race members, and (c) a jacket which embraces the outer race member (d) provided with an inwardly extending flange which overhangs the ends of the race members and is spaced therefrom to provide a sealing chamber (e) and with the inner edge of the inwardly projecting flange clearly spaced from the extension of the inner race member to provide radial play. The Dull patent was not considered by the Patent Office and claim 1 of the patent reads word for word squarely on the disclosure of the Dull patent. Although the Dull patent was not issued until after the filing of the application which resulted in the grant of the patent in suit, the file wrapper history of said patent in suit, shows that the applicant, Adams, filed an affidavit claiming a date of conception of the subject-matter as of January, 1930, more than two years later than the filing date of the Dull application. While the Dull patent does not disclose the use of a felt seal within the sealing chamber formed by the overhanging portion of the jacket E, claim 1 of the patent in suit contains no reference to a felt seal either. The use of felt seals, however, is shown to be old and common in the art, examples of such seals being shown in not only the three patents which were before the Patent Office, but in many other patents and publications introduced in evidence by the defendant.

62. The use of felt seals in a sealing chamber formed between an overhang from the outer race member and an extension of the inner race member and sealing the bearing both radially and axially, is shown to be old and common in the patent to Dlesk, No. 1,420,416 issued June 20, 1922. Also in the patent to Schneebeli, No. 1,503,920 issued August 5, 1924, wherein the member 29 embraces the outer race and has an inwardly extending overhanging portion that terminates short of a non-integral extension of the inner race and is formed with an angular cross-section between which, and the angular cross-section formed of the member 25, which is in effect an extension of the inner race, a felt seal or packing 42 is provided whereby both axial and radial sealing of the bearing is effected, and furthermore, substantial radial clearance between the innermost end of the overhang-

ing portion and the extention 25 of the bearing is clearly shown.

Radial and axial sealing is also disclosed in the patent to Beemer, No. 1,703,-380, issued February 26, 1929, on an application filed February 7, 1927, wherein a member 17 is fitted within the end of the outer race member and has an inwardly extending flange that terminates short of an extension of the inner race member to provide radial play and a felt seal 16 is mounted between angular cross-sections formed on the extension of the inner race member and by the member 17. Axial and radial sealing of a bearing by means of a felt seal confined between opposed members of angular cross-section is also shown in Fig. 178 of the publication "Handbook on Ball and Roller Bearings", by A. W. Mac-Cauley, published in London in 1924. Double axial and radial sealing of an anti-friction bearing by means of opposed angular cross-sectional members secured respectively to the inner and outer races is also shown in Fig. D on page 142 of the publication of the Timken Roller Bearing Company entitled "Wherever Wheels and Shafts Turn" while single radial and axial sealing is also shown in Fig. E on the same page of the same publication.

In view of the fact that the prior art shows numerous examples of radial and axial sealing with adequate clearance between an overhanging portion of the outer race member and an extension of the inner race member, to permit radial play in cheap non-precision bearings, and moreover, in view of the widespread use of felt seals for all types of anti-friction bearings, the use of a felt sealing member by patentee between the disk E-7 of Dull and the so-called hat-shaped seal E-4, or between the two hat-shaped members 11–12 and 14–15 of the patent to Reynolds, No. 1,441,190 issued March 20, 1923, would involve merely the exercise of mechanical skill.

63. The fourth patent in suit, No. 2,077,-188, discloses a roller conveyor consisting of a plurality of rollers 9. These rollers are arranged in pairs with each pair of rollers mounted in a supporting frame consisting of two longitudinally extending side members connected together to form a unitary structure by means of transverse braces 12. Each frame member is in turn supported by four coil compression springs and the inventive step claimed is that of providing means for placing the springs under a pre-compression substantially equal to the load to be carried by the rollers when the load is uniformly distributed over a plurality of adjacent rollers and so that yielding of the rollers out of the pre-determined plane in which they are set in assembling the conveyor would only occur due to unevenness in the lower surface of the load which contacts with the rollers in its passage along the conveyor. The patent contains ten claims, all of which, with the exception of claim 4, are variously limited to the provision of a plurality of "unit supporting means" and to the carrying of a "plurality of rollers" rotatably in said supports. Claim 4 of the patent is also limited to a plurality of resilient roller supports and states that a roller is carried by each of said supports.

64. Defendant's structure alleged to infringe does not have unit supporting means of the type shown in the patent in suit in which a plurality of rollers is carried. Instead, defendant's device is one in which each individual roller of the conveyor alleged to infringe is carried by a pair of resilient supports so that it can not be properly stated that any one of the resilient supporting means used in defendant's construction supports either a plurality of rollers or that any one of each resilient support of defendant's device serves to support a roller.

65. The file wrapper history of the Rishel patent in suit shows that in the prosecution of the application for the patent in the Patent Office the applicant endeavored to secure claims drawn to a conveyor roller (singular) with means for resiliently supporting the roller and for retaining the resilient means under pre-determined compression at least equal to, or greater than, the weight of the normal load to be conveyed (original claim 1). This claim, and claims similar thereto, were rejected on references cited by the Examiner and were cancelled. In order to find infringement, it would be necessary to accord the claims of the patent drawn to the "unit supporting frames with a plurality of rollers carried thereby," substantially the same scope as claims which were cancelled to secure the allowance of the patent. The rejection and cancellation of such claims forms a file wrapper estoppel which precludes giving the claims an interpretation of such breadth.

It is clear that the defendant's accused structure does not read upon any of the claims of the patent in suit, and hence does

not infringe. However, the defendant has contested the validity of this patent and is entitled to an adjudication. The file wrapper history shows that the following patents were cited by the Examiner during the prosecution: Bohn, No. 1,562,680, Haiss, No. 1,773,526, Todd, No. 21,386, Johnson, No. 1,749,431. The Examiner relied principally upon the Haiss and Bohn patents and rejected all of the original claims, except No. 13.

The applicant's attorneys then pointed out that "In the appended claims the term 'freely rotatable rollers' is used in its broadest sense to mean that the rollers can rotate freely on their supports at all times irrespective of the weight of the load that is passing there-over, and there are no brakes or other friction means associated therewith to limit free rotation of the rollers at any time," and thereafter substituted this language in an attempt to avoid a conflict with the prior art patents, particularly that of Bohn.

Everything that is shown in the patent in suit is present in the Bohn device and the device described in the patent in suit functions in precisely the same manner as the structure shown in the Bohn patent, except for the effect of the braking board 15. In other words, the patent in suit functions exactly the same as the Bohn device when it is adjusted to eliminate the effect of the brake.

A reading of the Bohn specifications clearly shows that the inventor contemplated that his invention would operate in the same manner as the patent in suit whenever it was inadvisable to have the brake in operation. By a careful selection of words the attorney in this case avoided saying that the patent in suit eliminated the braking effect of the Bohn patent by eliminating the board 15 instead of adjusting the springs as taught in lines 16 to 20 of page 2 of the Bohn patent.

This alternative would have been obvious to any skilled mechanic. If this can be considered an improvement over the Bohn device it did not require any exercise of the inventive faculties. Mr. Rishell, the patentee, testified that he recognized that all that was needed to overcome the difficulties they were having was to mount the rollers on springs. If he had looked at the Bohn patent he would have seen all that he claims that he and the engineers associated with him discovered. This Rishell patent discloses nothing that was not taught by the Bohn patent.

67. Having reached the conclusion that none of the structures illustrated in the plaintiff's catalogues are protected by valid patents, it follows that the defendant has the right to manufacture and sell such articles. Having the right to manufacture and sell such articles, it has the right to illustrate them in its catalogues, notwithstanding the fact that the plaintiff may have valid copyrights on its catalogues.

The articles illustrated are all in the public domain, and the defendant did not make direct copies of the illustrations or of the text of the copyrighted publications for the purpose of saving itself labor, time and expense. It employed its own commercial artist, who used his own technique in making such illustrations, and he made original, independent productions, and not copies of the plaintiff's copyrights.

If it can be said that there is sufficient artistic merit in the illustrations in the plaintiff's copyrighted catalogues to sustain the validity of such copyrights, it, nevertheless, would not sustain a charge of infringement, for the reason that the defendant did not adopt the plaintiff's art, but devised its own system of illustration.

### Conclusions of Law.

1. The sale made to Chevrolet for installation in the Tonawanda plant was not included within the terms of the agreement of May 1, 1920, and the defendant was not obligated to fill this order with Mathews products.

The relationship which existed between the plaintiff and defendant was not that of principal and agent. The defendant did not agree to act on behalf of the plaintiff and become subject to its control. Plaintiff sold its goods to the defendant f.o.b. Ellwood, Pennsylvania, and the plaintiff was not conducting business in Michigan through the defendant as its agent. When the goods purchased from the plaintiff by the defendant were re-sold to third parties, this transaction was entirely under the control of the defendant and the sale was made exclusively on its account: "Agency is a relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act." Restatement of the Law of Agency, Chap. 1, § 1; Standard Fashion Company v. Cummings, 187 Mich.

196, 153 N.W. 814, L.R.A.1916F, 329, Ann. Cas.1916E, 413. Defendant is under no obligation to account to plaintiff for the profits derived from the Chevrolet sale.

■ 2. Nothing less than conduct tending to pass off one man's merchandise as that of another will constitute unfair competition. Socony Vacuum Oil Company v. Rosen, 6 Cir., 108 F.2d 632; Clipper Belt Lacer Co. v. Detroit Belt Lacer Co., 223 Mich. 399, 194 N.W. 125.

■ The defendant had the right to use the same letters and numerals in advertising parts of a conveyor manufactured by it that the plaintiff used for the purpose of defining kind, shape and size. It never represented to the public that the goods manufactured by it were products manufactured by plaintiff. In its advertising and direct contact with purchasers, it went to great length to inform customers that the goods it sold were not manufactured by plaintiff.

The defendant had the right to advertise and make the most, by legitimate means, of the familiarity its officers and employees had with the manufacture and installation of conveyors, including the use of pictures of various conveyors installed by it, provided that it took reasonable precautions to make it clear that the goods sold by it were its own goods and of its own manufacture, and not that of the plaintiff.

Plaintiff has failed to establish its charge of unfair competition and it is not entitled to an injunction or an accounting on this ground. Dennison Mfg. Co. v. Scharf Tag, Label & Box Co., 6 Cir., 135 F. 625; Deering Harvester Co. v. Whitman & Barnes Mfg. Co., 6 Cir., 91 F. 376; Knabe Bros. Co. v. American Piano Co., 6 Cir., 229 F. 23. Also see Edwin L. Wiegand Co. v. Harold E. Trent Co., 3 Cir., 122 F.2d 920, decided June 30, 1941.

■ The issuance of a patent creates a presumption of validity, but patents cannot be sustained on presumptions alone. Kemper-Thomas Co. v. J. P. Gordon Co., 6 Cir., 67 F.2d 478-480.

■ 4. The use of mere skill to produce a desired improvement does not constitute invention. It did not require an exercise of inventive genius to discover that by swaging the end of the conveyor roller over the adapter disclosed by the Buck patent No. 1,445,821 the adapter would be held more firmly in place, and therefore patent No. 1,720,255 is void for want of invention. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438; Minnesota Mining & Mfg. Co. v. Coe, 69 App.D.C. 217, 99 F.2d 986.

■ 5. The use of two stampings instead of one to form the adapter as disclosed in patent No. 1,876,534 is merely a designer's choice. This practice would occur to any mechanic skilled in the art, and this patent is void for want of invention. Concrete Appliances Co. v. Gomery, 269 U. S. 177-185, 46 S.Ct. 42, 70 L.Ed. 222. Hollister v. Benedict & Burham Mfg. Co., 113 U.S. 59-72, 5 S.Ct. 717, 28 L.Ed. 901.

■ 6. Patent No. 2,023,718 follows the teachings of Dull patent No. 1,772,711, with the addition thereto of a felt washer. The use of felt packing as disclosed in this patent was well known in the art long before the claimed invention. This combination of old elements into a new device did not produce a new mode of operation, and consequently patent No. 2,023,718 is void for want of invention. Concrete Appliances Co. v. Gomery, supra; Hollister v. Benedict & Burham Mfg. Co., supra.

■ 7. The conveyors installed by the plaintiff at the Bethlehem Steel Company's plant at Sparrowspoint, Maryland, follows the teachings of the prior art rather than the teachings of patent No. 2,077,188, and hence there is no infringement.

■ 8. A question of priority of invention where a patent is attempted to be invalidated by a prior patent is a question of fact. Bischoff v. Wethered, 9 Wall. 812, 76 U.S. 812, 19 L.Ed. 829.

■ In view of the finding that the matter covered by the Rishell patent No. 2,-077,188 was not novel at the time of the alleged invention, it follows that this patent is void.

Merely eliminating the brake from the Bohn structure, and thus discarding the function performed by this element, did not amount to invention. National Hat Pouncing Machine Co. v. Hedden, 148 U.S. 482, 13 S.Ct. 680, 37 L.Ed. 529; McClain v. Ortmayer, C.C., 33 F. 284; Id., 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800.

■ 9. A copyright grants to the author or publisher the exclusive right of multiplying copies of what he has written or printed. It follows that to infringe this right, a substantial copy of the whole or of a material part must be produced. Perris v. Hexamer, 99 U.S. 674, 25 L.Ed. 308;

White-Smith Music Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655, 14 Ann. Cas. 628; Carr v. National Capital Press, 63 App.D.C. 210, 71 F.2d 220.

 The test as to infringement of a copyright is whether the work claimed to constitute an infringement is an independent production, or a copy of the copyrighted work. Jones Bros. Co. v. Underkoffler Co., D.C., 16 F.Supp. 729.

 The differences between the defendant's accused publications, and the plaintiff's catalogue, are so apparent as to preclude the belief on the part of the customer of ordinary intelligence that the defendant's catalogue is an advertisement of the plaintiff's wares, and there is no infringement. Hamilton Mfg. Co. v. Tubbs Mfg. Co., D.C., 216 F. 401; Baker v. Selden, 101 U.S. 99, 106, 25 L.Ed. 841; Lamb v. Grand Rapids School Furniture Co., C. C., 39 F. 474; Mott Iron Works v. Clow, 7 Cir., 82 F. 316, 319.

10. A judgment may be entered dismissing the complaint with costs to the defendant.