CLIPPER BELT LACER CO. v. DETROIT BELT LACER CO.

TRADE MARKS AND TRADE NAMES—UNFAIR COMPETITION—FRAUD.

Where plaintiff had patented a power belt lacing machine which it claimed to sell without profit for the purpose of creating a demand for its carded hooks, which were not patented, to be sold for use in said machine, and which was a profitable business, it was not entitled to an injunction restraining defendant, a competitor, from manufacturing and selling belt hooks carded and spaced like those of plaintiff and usable in its machine, for the purpose of protecting "the integrity of its unique selling system," in the absence of evidence of deception, misrepresentation, or confusion of goods amounting to unfair competition; there being no monopoly of proportions or measurements, in the absence of patent protection.

Appeal from superior court of Grand Rapids; Brown (William B.), J., presiding. Submitted October 4, 1922. (Docket No. 9.) Decided June 21, 1923.

Bill by the Clipper Belt Lacer Company against the Detroit Belt Lacer Company for an injunction and an accounting. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Knappen, Uhl & Bryant* (*Chappell & Earl* and *John L. Mechem*, of counsel), for plaintiff.

*Charles H. Hatch* (*Whittemore, Hulbert, Whittemore & Belknap*, of counsel), for defendant.

STEERE, J.   The parties to this suit are corporations organized under the laws of this State and competitors in the manufacture and sale of belt lacing

---

The right to protection against use by rival of similar design, shell or pattern not protected by patent is discussed in notes in 19 L. R. A. (N. S.) 269; 37 L. R. A. (N. S.) 259.

machines and metallic staples or hooks, also called lacers, for lacing belts. Plaintiff has its principal office and place of business in the city of Grand Rapids and defendant in Detroit, Michigan. Plaintiff filed this bill of complaint in the superior court of Grand Rapids to restrain defendant from selling its belt lacing hooks carded with spaces exactly the same as plaintiff's, for an accounting to reach profits claimed wrongfully made by defendant and for damages suffered by plaintiff in consequence thereof. The controlling relief asked, as stated in its bill of complaint, is—

"(a) From manufacturing or selling its belt hooks so carded as to be substantially as the carded belt hooks of plaintiff are spaced, and from carding its belt hooks or selling the same when carded, with such hooks so spaced that its cards of hooks can be inserted in plaintiff's belt lacer machines for use in connection with said belt lacing machines."

No question of patent rights infringement is involved here, although at one time in the history of these companies they were in litigation upon that subject. Plaintiff does not deny defendant's right to manufacture and sell belt lacing machines and metallic lacers, or hooks, not so carded and spaced as to compete with those made by plaintiff. In their counsel's brief plaintiff's position is concisely stated as follows:

"The Clipper Company's claim was and is that it had, by its years of pioneer work, and at great expense, acquired an extremely valuable property in the demand for its carded hooks; and that defendant by taking its exact spacing with the intent to pirate this property, was guilty of illegitimate and unfair competition which should be stopped by injunction. * * *

"Appellant's property rights include not only the good will which it enjoys in its product, but the

peculiar means by which it has acquired such good will.   They include not only the public demand for its goods, but the unique selling system by which such demand was created and is now maintained.   Appellant insists, and rightfully insists, that the integrity of this system be preserved."

Both parties in their pleadings and proofs go quite extensively into their connection with the development of this improved system of lacing belts, and it appears that plaintiff's predecessors were of the pioneers in that development.   It is shown that prior to 1899 belts were laced in various ways, sometimes by metal hooks or lacers made and sold for that purpose, but all methods followed until several years later necessitated removal of the belt from the shaft and pulleys in order to lace it.   About that year an Englishman named Webb devised a plan of lacing with V-shaped sharpened hooks inserted and fastened by a hand plier.   By this method belts could be somewhat more conveniently and expeditiously laced without removing them from the shafting or pulleys.   A man named Conn purchased Webb's interest in the device and began manufacturing that kind of hooks.   He devoted some time to introducing the Webb method to factory users of belts and is credited with being the pioneer in the metal hook belt lacer business, although he did not get beyond the use of hand pliers.

In 1902 or 1903 the English firm of Mitchell & Gunn which dealt in Conn's hooks invented an improvement in the attaching device by use of a plate with recesses cut in it for the hooks, and wires running through them whereby the end of the belt could be placed between the hooks and the points quickly clinched into the belt with a mallet.

In 1905 J. B. Stone purchased the American rights

in the device of Mitchell & Gunn, and his brother, Frank A. Stone, went to Grand Rapids, Mich., where he started a belt lacer business under the name of J. B. Stone & Co., purchasing the belt hooks of Conn on a profit-sharing basis. An improvement was soon made in the belt hooks by manufacturing them with a long and short leg so that the ends would penetrate the belt at different alternating points and make a stronger lacing. This was known as the "Clipper Hook." In 1906 J. B. Stone & Co. devised an improvement on the Mitchell & Gunn lacing tool by the use of an eccentric pin which accommodated different sized hooks. In 1908 the copartnership was incorporated under the same name, which was later changed to the Flexible Belt Lacer Co. In 1910 it was recapitalized and Conn, who before that time was an independent dealer in hooks, was taken into the organization, conveying his rights to it for a certain amount of stock, and the corporation name was changed to "Clipper Belt Lacer Company," under which it still does business.

Prior to 1910 all lacer hooks were sold to the trade loose in boxes, or in bulk, and when used were separately placed in the tool for clinching, but in 1909 Stone planned for greater efficiency by ganging the hooks on pasteboard cards, and in 1910 Conn invented a machine for carding them with the same spacing used in their lacing tool.

In 1911 plaintiff put upon the market a power lacing machine, numbered 2, and later another of like design but greater strength, numbered 3. They took the place of the eccentric pin tool, were equipped with a magazine for holding the hooks and simplified inserting them into the belt ends by a single operation instead of hammering them together with a mallet. These improvements in appliances for belt lacing

proved of practical value and were favorably received by belt users.   To enlarge the market for its hooks, which was the profitable part of its business, plaintiff's salesmen were instructed to devote their attention to demonstrating and introducing to users of belts in factories and shops the power tools, which were sold as is claimed without profit, and let the tools act as "silent salesmen" to sell the hooks.

These power appliances, or lacing tools, were sold outright by plaintiff with no attempt to legally obligate purchasers to use its lacers, but in that connection agreeing to repair them when out of order if the purchaser would use the Clipper belt hooks. In 1919 plaintiff had sold over 100,000 power machines for applying lacers to belts and from a small number in 1906 had increased the market for its lacer hooks to a sale of over a million in 1919.

Defendant's connection with the belt lacing business was initiated in 1909 by M. W. Edgar of Detroit while the metal hooks were yet being sold in bulk by dealers.   He was at that time working on an automatic wire fence machine, when his attention was called to what was afterward known as the Reck & Gibbon tool for closing hooks into belts.   He found the Clipper hook for sale in bulk at hardware stores and, as he claims, conceived the necessity of ganging lacer hooks before the sale of machines for closing them, or of the hooks themselves, would be a profitable business, and it is not shown that he had any knowledge of the fact that Stone was then working on that proposition.   Which first conceived the idea may be an open question but, be that as it may, in 1909 he purchased a half interest in the Reck & Gibbon device and interested in it a patent attorney named Whittemore who purchased the other half, after Edgar worked out a satisfactory process of

ganging the hooks on crimped metal strips in a "staggering relation" with a suitable cement. The patent which had been applied for on the Reck & Gibbon lacing tool was granted and in March, 1910, Edgar & Whittemore formed a partnership under the name of "E-W Company." In September, 1911, they reorganized and incorporated under that name. In 1912 defendant changed from its Reck & Gibbon tool to a hand tool with certain features plaintiff claimed were an infringement on its Mitchell & Gunn patent. After some 2,000 of them had been marketed by defendant a suit was commenced against it by plaintiff, in 1913, for infringement. This litigation lasted over 3 years. Plaintiff's bill was dismissed by the Federal district court, but on appeal by plaintiff the United States circuit court of appeals reversed the district court and on November 14, 1916, enjoined defendant as prayed for in plaintiff's bill. (See *Clipper Belt Lacer Co.* v. *E-W Co.*, 150 C. C. A. 484, 237 Fed. 602.)

The various historical matters of development and difference between these parties are of rather remote bearing upon the issue of right to a particular spacing of ganged hooks, which is the controlling question here, though plaintiff dwells upon them in emphasizing its priority in improvements and development of a business which it claims defendant is trailing and pirating. It is, however, quite apparent that the ganging of hooks, which both took up at about the same time, was resorted to by plaintiff after it and its predecessors had been in the belt lacing business for several years, while with defendant's predecessors it was practically the starting point in entering upon that business.

Plaintiff and its predecessors have uniformly spaced their lacing tools and ganged hooks to a scale of

".144½ inch" between hooks or, in effect, six lacers to one inch in width of belt, adhering to the spacing originally adopted for the Mitchell & Gunn lacing tool.   Its counsel state this spacing had no inherent merit, served no functional purpose, its adoption was "accidental" and purely arbitrary.

Defendant's predecessor started with a spacing for its lacing tool and ganged hooks of ".125 inch" between hooks or, in effect, seven lacers to an inch in width of belt and was so continued until late in 1918 when it adopted practically the same spacing as plaintiff, which permitted its ganged hooks to be used in plaintiff's make of lacing machine.   This plaintiff contends was done for the sole purpose of using the Clipper machines to sell defendant's ganged hooks and reap the benefit of the *unique merchandizing system* plaintiff had built up by large expenditure of skill, money and effort, a method of unfair competition against which it is entitled to injunctive protection.

Admitting that the number of Clipper machines in the hands of users was a motive for its adopting that spacing in the direction of standardizing for the benefit of widest demand, as is done in the manufacture of screws, nuts, electrical appliances, keys of musical instruments, etc., defendant contends the proofs show other practical reasons existed for making the change. That it was found six hooks to the inch were adequate and best met the requirements for margin of belt outside the hooks, as Edgar had discovered in his experiments that in applying defendant's form of lacing to a one-inch belt on a flanged pulley the spreading of the belt interfered with the flanges; a further reason being that in adopting 6 hooks to an inch, which proved equally as good and in some cases better than 7, they effected by the change a saving of from 12 to 17 per cent. of wire used.

The point upon which plaintiff's claim of unfair competition centers, with other competitive rights of defendant conceded, is shown in the following excerpts from plaintiff's briefs:

"Defendant is entitled to sell belt hooks, the patent having expired excepting on the long and short legged hook. * * * Carded belt hooks may be sold by defendant or any one else. Machines for applying belt hooks in bulk or carded belt hooks may also be manufactured and sold by the defendant or any one else. The entire field is open to the defendant to manufacture and market any kind of lacing and any kind of belt hook, and any kind of tool for inserting the belt hooks either in bulk or carded. * * *
"As we have so often stated, the Clipper Company seeks no exclusive right in a spacing of .144½ of an inch for its products. The relief herein sought is the preservation of the integrity of the unique distribution system of the Clipper Company."

In their various briefs counsel for the respective sides supply abundant citations to the voluminous literature on the allied subject of trade names, trade marks and unfair competition, the foundation principles of which are said to be closely analogous. A large number of the many decisions upon those questions are cited in 26 R. C. L. p. 826 *et seq.*, under the title Trade marks, Trade names, etc. Unfair competition is there defined in general as follows:

"Unfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor. The rule is generally recognized that no one shall by imitation or unfair device induce the public to believe that the goods he offers for sale are the goods of another, and thereby

appropriate to himself the value of the reputation which the other has acquired for his own product or merchandize."

In Nims on Unfair Competition (2d Ed., § 4, pp. 12-16) the author devotes some five pages to definitions of similar import, mostly quotations from cited decisions, the first and last being as follows:

"The fundamental rule is that one man has no right to palm off his own goods as the goods of a rival trader, and 'he cannot, therefore,' in the language of Lord Langdale in *Perry* v. *Truefitt* (6 Beav. 66, 72), 'be allowed to use names, marks, letters, or other indicia, by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another person.' Referring to the above, Lord Herschell, in *Reddaway* v. *Banham* (App. Cas. [1896] 199-209), said: 'It is, in my opinion, this fundamental rule which governs all cases.'   *   *   *

"There is no hard and fast rule by which it can be determined when the court will interfere by injunction to prevent what is practically a fraud upon a person engaged in business by unfair methods of business. Each case must depend upon its own facts, but where it is clearly established that an attempt is being made by one person to get the business of another by any means that involves fraud or deceit, a court of equity will protect an honest trader and restrain a dishonest one from carrying out his scheme."

In the instant case, as said by the trial court and sustained by the proofs, except as to identity of spacing:

"There is no claim that there is similarity in the systems employed by the plaintiff and defendant in the carding of lacers. There is no claim that there is similarity in the appearance, shape, color or size of the boxes in which the defendant's product is packed and offered for sale to the public as compared with the boxes in which the plaintiff's product is packed and offered for sale to the public. There is no similarity in the trade name or any feature of the

advertising used by the defendant with that used by the plaintiff. The plaintiff uses the name 'Clipper Belt Lacer Company.' The defendant uses the name 'Bull Dog Belt Lacer.' There is no distinguishing marking with characteristics of the plaintiff's product which is imitated by the defendant's product. The defendant claims and advertises that its product is stronger and more durable than the product of the plaintiff, and at no time or place has the defendant's product of belt lacers been mistaken for or purchased or used as the belt lacer product of the plaintiff."

The facts unquestionably negative any element in the case of deceit, or defendant palming off or attempting to palm off its ganged hooks as the goods of a rival trader, but plaintiff contends that in boldly adopting the Clipper Company's exact spacing after it had developed a wide trade by its "unique method of distribution," and thereby misappropriating the profits it was entitled to reap, defendant appropriated an intangible property right of commercial value belonging to another by an outlaw system of merchandizing to which the doctrine of unfair competition applies, although no element of deception, misrepresentation or confusion of goods appears.

In support of the application of this "modern doctrine" to the case in hand plaintiff's counsel cite and reason from a long line of not unfamiliar cases dealing with unfair competition in its various phases, such as the ticket scalper cases, stock ticker cases, confidential information cases, Singer sewing machine cases, Prest-O-Lite cases, Curtis Publishing Co. cases, Coca-Cola cases, and various others, amongst which attention is particularly called to *International News Service* v. *The Associated Press*, 248 U. S. 215 (39 Sup. Ct. 68, 2 A. L. R. 293) ; *Schwanbeck Bros.* v. *Backus & Sons*, 148 Mich. 508; *Wagner* v. *Meccano Limited*, 158 C. C. A. 573, 246 Fed. 603. The latter

case was decided by the Federal circuit court of appeals, 6th circuit.   The same devices and similar claims were involved in *Meccano* v. *Wanamaker*, 162 C. C. A. 520, 250 Fed. 450, before the Federal circuit court of appeals, 2d circuit, where somewhat different conclusions were reached, the court there saying in part:

"The complainant cannot obtain a monopoly for all time of perforated plates of the length having equidistant holes and intervening spaces which it first used.   These are functional features of the units of construction which any one is at liberty to use.   Of course it cannot claim a monopoly of constructing these particular models or toys which it has made, as, for example, wheel-barrows, bridges, cranes, Ferris wheels, trucks, etc.

"Assuming that the public associates plates of this description with the complainant as a source, and that there is likely to be confusion because of similarity of the outfits, it is a question whether it is entitled within the decision of the Supreme Court in *Singer Manfg. Co.* v. *June Manfg. Co.*, 163 U. S. 169 (16 Sup. Ct. 1002), to more protection than that outfits made by others should be advertised and sold as the product of the makers under names and in packages which do not simulate the complainant's."

Plaintiff's counsel insist that its spacing is not a functional feature and has no special use or value to induce the selection, but was arbitrarily taken as an accidental, or "bastard measurement" in the Mitchell & Gunn tool and retained by plaintiff only because a change would destroy the value of tools previously distributed to the trade and entail other unnecessary expense; while it is claimed for defendant that spacing of ganged hooks on cards for the purpose of lacing is not a matter of indifference but a functional feature of the device, and in practical application approximately that measurement with six hooks to

the inch gives the best results as to margin of belt, and for other reasons pointed out.

Some of plaintiff's evidence tends to show that within an inch of belting the number of spacings with six hooks which would give equally good joints is quite limited. If so it is within the range of possibility for one, or an association, of those in that business to monopolize the trade by manufacturing lacing tools so spaced if thereby they could bar all others from such spacings. But whether functional or non-functional plaintiff admits "no exclusive right" to the spacing it has adopted and grounds its claim for relief on the proposition that defendant's otherwise right to free use of such spacing is limited by plaintiff's property right to protection "of the integrity of its unique selling system." If unique that system can scarcely be recognized as exclusive or original with plaintiff. Its salient features are as outlined a policy of selling a convenient and desirable tool for using lacing hooks, without profit and "merely as a matter of convenience to the user in order that he will purchase and repurchase his hooks for fastening his belts," the sale of hooks being the profitable part of the belt lacing business. Conceding plaintiff's lacing tools are sold without profit, which is denied, the scheme or system of selling without direct profit some convenient or necessary appliance adapted to the ready use of consumable or comparatively temporary commodities which the dealer handles and out of which the principal profits of his business are realized, thereby enlarging the demand for them, is not unfamiliar to the business world. The profits on re-fills or replacements constitutes the principal profit in various kinds of business. Except as protected by patents, the question is to what extent and by what methods other dealers may in the ordinary course of

trade compete for the increased demand and good will of consumers so developed within the field of fair competition.    As expressive of the generally recognized limit it is said in *Coats* v. *Merrick Thread Co.,* 149 U. S. 562 (13 Sup. Ct. 966) :

——"they have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals."

Plaintiff's counsel concede that the numerous unfair competition cases cited and to be found along those lines are good law, but dispose of them as inapplicable here, since no question of palming off is involved, and say that:

"Under the old rigid doctrine of unfair competition there was perhaps nothing that the Clipper Company could do about it.    Under the modern doctrine as exemplified in the *Schwanbeck* and *International News* cases, these 'peculiar, subtle forms of competition' being morally wrong are also held legally wrong."

In *Schwanbeck Bros.* v. *Backus & Sons, supra,* there is no discussion of the doctrine of unfair competition. The trouble arose over claimed malicious conduct of defendant in attacking plaintiff's business and integrity, under an alleged spurious charge that it was infringing a patent, instead of testing the question in a proper tribunal as plaintiffs offered to do.    The conduct sought to be restrained was defendant's systematically defaming its business to customers, spying it and following its discovered shipments to outside customers by registered communications containing false charges and threats of litigation if they used plaintiff's goods, with other malicious activities tending to intimidate plaintiff's customers and seriously injure its legitimate business.    This court confirmed the decree of the lower court granting an

injunction restraining continuation of such acts of meddling and intimidation, commanding amongst other things that defendant desist from hiring agents. to enter plaintiff's factory, follow its wagons, go to the freight depot to ascertain to whom it was shipping goods, and:

—"after having ascertained who are the customers of complainant, from, either yourself, or confederating with any of the other defendants herein, or any other person, for the purpose of intimidating the customers of complainant, either verbally or by sending out circulars or letters threatening them with litigation if they purchase or use the goods manufactured by complainant, in the manner shown in the circular contained in the bill of complaint, or in any other manner injurious to complainants."

In affirming the decree this court there said the important question in the case was one of facts, without any statement as to the principles of law warranting an injunction, except by reference to *O. & W. Thum Co.* v. *Tloczynski,* 114 Mich. 149 (38 L. R. A. 200, 68 Am. St. Rep. 469), and "especially" *Emack* v. *Kane,* 34 Fed. 46. The *Emack Case* involved the question of the court's power to restrain the defendant from intimidating complainant's customers with bad faith threats of patent litigation, and the *Thum Case* the question of an employee disclosing trade secrets in violation of an agreement not to do so entered into as a condition of his hiring. No questions of intimidation of customers by threats of litigation or revealing trade secrets are involved in the instant case. Intimidation of dealer's customers by *mala fides* threats of patent litigation and revealing trade secrets in violation of contract would seem to be proper subjects for equity action by injunction, whether the offender was a competitor in business or actuated by other motives.

*International News Service* v. *The Associated Press, supra,* was decided by a divided court and, with the authorities cited, instructively reviews the subject of unfair competition in its various aspects.    The litigants were competitors in gathering news from all parts of the world and distributing its publication for profit to newspapers throughout the United States. Complainant's expenditures in that service were said to be approximately $3,500,000 per year and defendant's over $2,000,000.    The Associated Press accused the International News Service of pirating practices, and filed a bill to restrain it from securing news the former had first obtained by bribing its members' employees, inducing its members to disclose Associated Press news to the latter in violation of by-laws of the association, and from copying news from bulletin boards and early editions of the Associated Press newspapers and selling the same to International News Service customers.    The court held in the majority opinion that the underlying questions as presented were: Whether there is property in news; if so, whether when collected for publication it survives the instant of its publication in the first newspaper to which it is communicated by the news-gatherer, and whether defendant's course of conduct in so appropriating for commercial use matter taken from bulletins or early editions of Associated Press publications while a property value giving right to its use for wider  distribution yet remained in complainant constituted unfair competition in trade.    This the court said was not always limited to defendant attempting to palm off its goods as those of complainant, "characteristic of the most familiar, if not most typical, cases of unfair competition."    On those questions the court held that news matter was *quasi*-property for the purposes of their business because both parties

were selling it as such, and there were in defendant's conduct besides misappropriation elements of imitation and false pretense, saying:

—"the entire system of appropriating complainant's news and transmitting it as a commercial product to defendant's clients and patrons amounts to a false misrepresentation to them and to their newspaper readers that the news transmitted is the result of defendant's own investigation in the field."

Plaintiff in the instant case could not have and does not claim any property right in the spacing under consideration.

"No court has ever gone to the extent of permitting the establishment of a monopoly of proportions or measurements, in the absence of some patent protection. To do so would be to engross the particular business." *Harvey Hubbell, Inc.,* v. *General Electric Co.,* 262 Fed. 155.

In the *Hubbell Case* injunction was sought to restrain the General Electric Company from invasion of complainant's alleged property rights by unfair competition resulting from the latter copying sizes and shapes which the former had adopted in various of its electrical devices, and as to which it has "by its energy, industry and expenditure of large sums of money throughout a period of 10 years prior to filing of the bill, established and built up a system of doing business, constituting a service to its customers, which resulted in good will and business," entitled in equity to protection from invasion by such competition. Unfair competition was charged against defendant in copying physical characteristics of some 10 of complainant's devices. No question of infringement of patent was involved. Complainant had among other things made and sold about 13,000,000 receptacles and plug bases with tandem slots, 18,000,000 tandem blade

caps adapted to co-act with those receptacles and bases, 1,250,000 receptacles and plug bases having parallel slots and an equal number of parallel blade caps adapted for co-action therewith (the sizes and shapes of various parts being arbitrarily selected) when defendant openly adapted those sizes and shapes, thereby making its parts interchangeable with those of plaintiffs. Broadly viewed the primary purpose of electrical appliances is to create a market for electrical current. A monopoly in the use of many electrical appliances is protected by patent. The court said that in the absence of patent protection there could be no monopoly of proportions or measurements, and held that no exclusive right was acquired in complainant's arbitrarily selected sizes and shapes of parts which precluded other manufacturers from adopting them for the purpose of standardizing and making them interchangeable with those of each other and of complainant. Moral and ethical standards of business were not discussed and, perhaps unfortunately, cannot always be taken as the test of legal rights in business competition.

Plaintiff avoids the Clayton act (38 U. S. Stat. p. 731) against monopolistic methods of creating a demand on an unpatented commodity by selling its lacing tool outright, without binding the purchaser to use its lacing hooks; but if it can prevent dealers in lacing hooks from putting on the market ganged hooks spaced the same as those it sells, it is as well or better off than if its spacing was a monopoly legalized by a patent. An injunction such as asked for here would have the practical effect of putting plaintiff in as good a position with a longer period of absolute control of its arbitrarily selected spacing than as though it were protected by a patent, which must eventually expire.

Plaintiff has a patent on its belt lacing machine which it claims to sell at cost to create a market for its ganged hooks. Although the case is not directly in point, the following reflections of the court in *Motion Picture Patents Co.* v. *Universal Film Co.*, 243 U. S. 502 (37 Sup. Ct. 416, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959), seem pertinent:

"It is argued as a merit of this system of sale under a license notice that the public is benefited by the sale of the machine at what is practically its cost and by the fact that the owner of the patent makes its entire profit from the sale of the supplies with which it is operated. This fact, if it be a fact, instead of commending, is the clearest possible condemnation of, the practice adopted, for it proves that under color of its patent the owner intends to and does derive its profit, not from the invention on which the law gives it a monopoly but from the unpatented supplies with which it is used and which are wholly without the scope of the patent monopoly, thus in effect extending the power to the owner of the patent to fix the price to the public of the unpatented supplies as effectively as he may fix the price on the patented machine."

We find no occasion to disturb the conclusion reached by the trial court. The decree is therefore affirmed, with costs to defendant.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, and SHARPE, JJ., concurred. MOORE, J., did not sit.