**CLAIROL, INC., Plaintiff-Appellee,**

v.

**BOSTON DISCOUNT CENTER OF BERKLEY, INC., et al., Defendants-Appellants.**

**No. 77–1171.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 15, 1979.

Decided Nov. 1, 1979.

Irwin Alterman, Hyman, Gurwin, Nachman, Friedman & Winkelman, Southfield, Mich., for defendants-appellants.

Wolfgang Hoppe, Miller, Canfield, Paddock & Stone, Detroit, Mich., for plaintiff-appellee.

Before EDWARDS, Chief Judge, and CELEBREZZE and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Clairol, Inc. brought ten separate but similar diversity actions in the district court against various retail and wholesale drug and cosmetic outlets in the Detroit area, seeking to prohibit them from selling its professional-use or "salon" products to the general public, contending that this product diversion constituted unfair competition under Michigan law. Clairol's complaints basically alleged and the defendants generally admitted, that the latter had, prior to the filing of the action, displayed, offered for sale and in fact sold at retail, bottles of Miss Clairol which had been manufactured and produced by Clairol for "salon" use only and which bore Clairol's trademarks and the "Professional Use Only" label as affixed by it. Further, the defendants admitted that they did not supply test instructions to the purchasers. The precise amount of this product diversion and the source of it did not clearly appear from the proofs, but the fact of the diversion appears to be undisputed.

Seven of these cases were consolidated for a non-jury trial before United States District Judge Fred W. Kaess, after those defendants had filed counterclaims and defenses, alleging that Clairol's conduct in restricting the sale of its professional product violated Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1 (1976).[1] In an opinion reported at 191 U.S.P.Q. 632 (E.D. Mich. 1976), the district judge entered a judgment in favor of Clairol on its complaint and against the defendants on their antitrust counterclaim and defenses. We affirm.

## I. FACTS

We repeat the facts here essentially as found by the district judge.

---

1. Two of the cases were settled prior to trial. The third case was decided by Judge Freeman on stipulated facts and is not a part of this appeal. *Clairol, Inc. v. Asaro,* 1975–1 Trade Cases (CCH) ¶60.350 (E.D.Mich.1975). Defendants in five of the remaining seven cases have appealed.

Clairol manufactures and distributes throughout the United States certain hair coloring preparations containing coal-tar dyes, one of which is Miss Clairol Hair Color Bath [hereinafter "Miss Clairol"]. Clairol expends substantial sums of money to advertise and promote these products and over the years has been able to create and maintain a valuable reputation and goodwill in the trade and among the general public in connection with this product. The sale of Miss Clairol constitutes a considerable portion of the company's revenue with sales exceeding $9 million annually.

Clairol markets Miss Clairol hair coloring products through two distinct channels of trade. Miss Clairol "salon" product is sold through distributors only to beauty salons and beauty schools. Miss Clairol "retail" product is sold by the company either directly to large retail chains or to wholesalers who in turn sell to retail stores for ultimate resale to the general public for home use. This dual distribution system has existed since Clairol entered the retail market in the 1950's.

Clairol charges a substantially lower price for its salon product than it charges for products it sells to the retail trade for resale to the general public. Thus at the time of trial, the salon product was sold by Clairol for $6.12 per dozen bottles whereas the comparable retail product was sold wholesale at a price of $11.67 per dozen bottles.

From 1955 until after the initiation of this suit, the chemical formulation of the retail and salon Miss Clairol was identical. Late in 1974, however, Clairol re-formulated the retail product by eliminating certain unstable intermediate dye components, purportedly for the purpose of insuring that the hair color would not fade as rapidly as

it had in the past, Clairol's research having revealed that the ordinary home user of the dye did not reapply it as frequently as did the customer who had her hair professionally colored. This reformulation was titled and advertised under the additional trademark, "Natural Wear."[2]

Before 1963 Clairol sold Miss Clairol to both the salon and retail trade in identical packaging. Each bottle was enclosed in an individual carton containing a detailed printed instruction sheet for use. In 1963, however, the salon product was no longer packaged in individual containers but was instead placed in a 6-pack carton containing a single instruction booklet. The salon instructions differ slightly from those included in the retail product. These packaging changes were made for the dual purpose of combatting diversion of the sale of the salon product to the retail market and for greater efficiency in manufacturing and distribution. The proofs showed that Clairol achieved a cost saving of about $500,000 per year from the change.[3]

The retail Miss Clairol is now packaged differently from the salon product. Each bottle is enclosed in an individual yellow carton, bearing the conspicuous cautionary statement:

> CAUTION: This product contains ingredients which may cause skin irritation on certain individuals, and a preliminary test according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows; to do so may cause blindness.

The foregoing statement also appears on the bottle label as required by the Federal Food Drug and Cosmetic Act § 601(a), 21 U.S.C. § 361(a) (1976).[4] The salon product,

---

**2.** We do not consider that this change in the chemical formulation necessarily renders moot any questions concerning conduct prior to the change. At least at the time of trial, the pre-Natural Wear product was still on the market. Also, Clairol's claims for money damages have not yet been adjudicated.

**3.** Appellants claim that the savings amounts to less than two cents per bottle and in consequence argue that the 46 cent price differential

per bottle cannot be explained except as anti-competitive marketing practices. However, no cost figures were submitted concerning advertising and other overhead expenses incident to selling for the retail trade.

**4.** The retail sale of hair color for consumer use without such warning subjects the product to *in rem* seizure by the Food and Drug Administration. 21 U.S.C. § 334 (1976). Violations of Section 361(a) further subject the violator to

on the other hand, being sold for use of professional beauticians and beauty schools only, is not required to bear such an instruction since it is not injurious "under such conditions of use as are customary or usual." 21 U.S.C. § 361(a) (1976).

The trial judge further found that the individual retail box serves several functions. It insures that the instructions inserted within the carton are actually received by the purchaser. It protects the ingredients from deterioration due to light and heat while on display within the retail store.[5] The consumer carton package allows the prospective purchaser to preview the shade range which she can expect upon application of the particular hair color by means of a woman's picture on the bottle label, seen through a window in the carton. This arrangement also permits an identification at the moment of sale between extensive consumer advertising carried on by Clairol, which prominently features the carton, and the product as seen on the retailers' shelves. Finally, the individual container protects the bottle from becoming shopworn and advises the purchaser that the product has the Good Housekeeping Seal of Approval.

Each retail carton also contains a carefully prepared and copyrighted booklet providing detailed information and instructions to enable the untrained consumer to obtain safe and satisfactory results. These instructions include certain hints on the use of the product, warnings against use of certain colors in combination, special instructions for a patch test to determine the possibility of allergic reaction, and special instructions for a strand test which enables the customer to test the product against a small amount of hair before applying it

generally. These instructions on the individual packaging are not required for the professional products since beauticians are specially trained in the use of hair coloring preparations containing coal-tar dyes.

Clairol packages its 6-pack of Miss Clairol salon product in a single carton with only one sheet of instructions describing the anti-allergy test. In addition, however, each salon bottle and the 6-pack carton for the salon bottle are labeled:

PROFESSIONAL USE ONLY WARNING

Cautionary statements regularly required for sale to non-professionals and instructions essential to the use of this product by non-professionals are not included on bottle labels. Non-professional sale may result in prosecution under federal law.

The salon instructional sheet does not contain the warning that preliminary patch and strand tests should be given before each application of the product, and does not contain other directions which are provided with the retail product.

Upon the proofs, the district judge found that use of Miss Clairol without proper instructions can cause allergic reactions or customer dissatisfaction because of hair discoloration or damage or other unsatisfactory result. These in turn lead to the loss of goodwill and, he found, may result in the filing of legal actions against Clairol, subjecting it to the expense of defending such suits and also, of course, to consequent adverse publicity for the product. Since the salon product and carton do not carry the model's picture showing the range of shade to be expected, the trial court found that an unwary customer could more easily take an incorrect shade and become disappointed

---

injunctive relief and criminal penalties. 21 U.S.C. §§ 332–33 (1976).

**5.** While the appellants assert that the proofs fail to show any case of actual injury, the trial judge credited testimony that exposure of the formula to light and heat causes chemical changes. Hence the blue tone dye intermediates deteriorate more rapidly than do the red dyes contained in the hair coloring, making it possible that a hair coloring which has been exposed to heat and light over an extended

period of time might produce a redder shade than that chosen by the purchaser. This light exposure, he found, would also adversely affect the customer's satisfaction if, for example, the product was used as a touch-up or reapplication to hair which had been dyed earlier. Since virtually all of the customers of Miss Clairol are repeat customers, the risk of non-uniform results when the product is applied as a touch-up is enhanced.

with the results obtained. Although the defendants have generally had available color selector charts furnished by Clairol showing the picture for each shade, these charts were not always found in close proximity to the salon bottles, and of course, would not have been available to the home consumer after the bottle left the store. It also appeared that the color of the liquid bears little resemblance to the shade which results when the product is applied to the hair.

These are the basic facts found by the district court. Additional facts in evidence which the defendants claim are relevant to their antitrust defense are set forth in section III of the opinion.

## II. UNFAIR COMPETITION

Clairol alleged, and the court found, that the defendants' practice of selling Miss Clairol salon product to the general public for consumer use constituted unfair competition under Michigan law.

Unlike many other states,[6] Michigan had no statute governing the precise type of conduct alleged to be unlawful here at the time this cause of action arose.[7] Case law, however, has recognized that Michigan follows the general law of unfair competition. See *A & M Records, Inc. v. MVC Distributing Corp.*, 574 F.2d 312, 313 (6th Cir. 1978); *Tas-T-Nut Co. v. Variety Nut & Date Co.*, 245 F.2d 3, 8 (6th Cir. 1957). In deciding that defendant's conduct constituted unfair competition, the trial judge took particular note of the passage in 3 Callman, *Unfair Competition Trademarks and Monopolies* (3d ed., 1969), § 84.2(c):

> It should be remembered that the article and the trademark comprise a unit. The dealer, unlike the consumer, acquires no absolute ownership in the article; he buys subject to the implied obligation to resell in accordance with the intentions of the trademark owner. If this were not

so, then the trademark owner who, by advertisement, had popularized his trademarked article would run the risk of being put into a position wherein he would be incapable of fulfilling his public promises * * *

And at footnote 3:

> The manufacturer's goodwill may be damaged if the dealer omits information concerning the use of the product, which may differ for experts and the public. See *Clairol, Inc. v. Peekskill Thrift Drug Corp.*, 141 USPQ 147 (NYSupCt1964); *Clairol, Inc. v. L. H. Martin Value Center, Inc.*, 40 Misc.2d 875, 244 N.Y.S.2d 210, 139 USPQ 462 (1963).

191 U.S.P.Q. at 640.

The defendants argued before the district court that their sales of the professional Miss Clairol could not constitute deceptive and hence unfair competition because they merely sold the product which Clairol had already put into commerce, unchanged and identified for what it was. In essence they urge that "palming off" one's product as that of another is essential to a cause of action in Michigan for unfair competition. Further, they claim that Clairol's only injury came about because of its own unlawful two-price structure. Defendants assert that Clairol cannot complain of any possible injury which might befall a customer and, therefore, subject Clairol to the danger of liability and loss of goodwill, since its own deliberate refusal to put adequate instructions on the salon bottle brings about that risk.

Judge Kaess, however, held that under applicable Michigan law, proof of "palming off" was not essential to a claim of unfair competition, although it was one of the more common forms of deception banned by the rule. In *Motor Improvements, Inc. v. AC Spark Plug Co.*, 80 F.2d 385 (6th Cir.) *cert. denied*, 298 U.S. 671, 56 S.Ct. 939, 80

**6.** *See, e. g.*, Ill.Rev.Stat. Ch. 121½, § 312 (1975); N.J.Stat.Ann. § 56:4–1 (West Supp. 1978–79); N.Y.Gen.Bus.Law § 368–d (McKinney 1968).

**7.** *But see* Michigan Consumer Protection Act, Mich.Comp.Laws Ann. § 445.901 *et seq.*, effec-

tive April 1, 1977. This Act defines and prohibits "[u]nfair unconscionable or deceptive methods, acts or practices in the conduct of trade or commerce. . . ."

L.Ed. 1394 (1936), defendant was charged with unfair competition under Michigan law in marketing an oil filter which, although not represented to be a product of the plaintiff, was misrepresented as having the same qualities as the plaintiff's patented filter. In reversing the district court's dismissal of the complaint, our circuit held that "palming off" was not the only manner of engaging in unfair competition:

> The appellee contends that since the bill does not allege that it is passing off its filter on the public as the filter of appellant, there is no showing of an invasion of a property right or the good will of appellant, and therefore nothing stated that would justify a court of equity in enjoining its methods of sale as unfair competition. It says that the most that the bill alleges is that it is deceiving the public by representations as to the quality and effectiveness of its filter, and the doing of that, in the absence of an allegation of the palming off of its filter as the appellant's, is not enough to support an equitable action for unfair competition. We agree as to the deception imposed upon the public, but we cannot agree that the palming off by one competitor of his goods as those of another is the sole test of unfair competition. While it is a common method of practicing such competition and, when indulged in, is held to be the essence of the wrong . . . [citations omitted] it is not the sole method, certainly not the sole ground, for equitable intervention to enjoin injury to a competitor's rights [Art. 9–a, Nims on Unfair Competition (3d Ed.) (1929)], . . ..

80 F.2d at 386. *See also Revlon, Inc. v. Regal Pharmacy, Inc.,* 29 F.R.D. 169 (E.D. Mich. 1961).

Defendants, on the other hand, argue that even if "palming off" is not a necessary element of proof, their conduct is nonetheless permissible under *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924) (Holmes, J.), a trademark infringement case, and *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947) (Douglas, J.) (decided under the Trademark Act of 1905).

In *Prestonettes,* the Supreme Court reinstated a district court judgment which permitted the plaintiff to unpack the defendant's product and resell it in smaller units as long as the labeling clearly informed the potential purchaser of what he was buying. The Supreme Court noted that the case did not involve any charge that defendant was adulterating or deteriorating plaintiff's product, and further recognized that a trademark, unlike a copyright, does not confer a right to prohibit use of the trademark symbol in all circumstances but confers upon the owner the limited right to prohibit the uses of the mark which are likely to cause confusion of buyers. Thus, Mr. Justice Holmes observed that "[w]hen the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo." 264 U.S. at 368, 44 S.Ct. at 351. *See also* 2 J. T. McCarthy, *Trademarks and Unfair Competition,* § 25:8, at 184–85 (1973).

In *Champion Spark Plug Co., supra,* the defendant reconditioned plaintiff Champion's spark plugs and resold them without clearly indicating that the plugs had been used. In *dicta,* the Supreme Court, citing *Prestonettes, supra,* observed:

> Inferiority is immaterial so long as the article is clearly and distinctly sold as repaired or reconditioned rather than as new. The result is, of course, that the secondhand dealer gets some advantage from the trade mark. But under the rule of *Prestonettes, Inc. v. Coty, supra,* that is wholly permissible so long as the manufacturer is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the dealer. Full disclosure gives the manufacturer all the protection to which he is entitled.

331 U.S. at 130, 67 S.Ct. at 1139 (footnote omitted).

From the foregoing decisions, the defendants reason that if full disclosure permits repackaging, as in *Prestonettes* and *Champion Spark Plug Co., a fortiori,* no unfair

competition can exist where defendants merely sell the identical and unaltered items which Clairol has put in commerce.

Reliance on these cases misses the mark. The issue is whether the defendants' conduct violates Michigan's law of unfair competition. The question is not simply whether defendants palmed off their own product as the plaintiff's and thereby deceived the public by appropriating plaintiff's name for their own product. Other practices may also constitute unfair competition under Michigan law; in *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.*, 338 F.Supp. 762, 767 (E.D.Mich. 1972), *aff'd without opinion*, 473 F.2d 910 (6th Cir. 1973), Judge Freeman discussed the Michigan law of unfair competition:

> Decisions of Michigan courts involving claims of unfair competition have been limited almost exclusively to the protection of names of corporations, buildings, and other businesses. . . . Nevertheless, it is clear that Michigan follows the general principles of unfair competition. See *Clipper Belt Lacer Company v. Detroit Belt Lacer Co.*, 223 Mich. 399, 407, 194 N.W. 125 (1923).

In *Revlon, Inc. v. Regal Pharmacy, Inc.*, 29 F.R.D. 169, 174 (1961), a case quite similar to the instant case and arising under Michigan law, Judge Freeman wrote:

> The reasoning applied by the courts in granting relief in those cases involving the traditional concept of palming-off one's goods as those of another as a form of unfair competition applies equally to situations such as that in the instant case where one person sells an inferior product of another as the other's superior product. The gist of the action in both situations,

as in all unfair competition cases, is fraud, and the gist of the charge is that the public is so misled that plaintiff loses some trade by reason of the deception.

■ Measured against principles of law which obtain in Michigan as throughout the United States, we agree with the district court that the defendants' practice of selling the professional bottles of Miss Clairol to the consuming public for home use constituted unfair and unethical practice.[8] The practice is damaging both to the public and to Clairol and constitutes in the most general sense a deceit and thus a fraud upon the public. The defendants sold the professional-use bottles of Miss Clairol without any warning, without further labeling, instructions for use, or other protection. In doing so, they admittedly have exposed Clairol to potential criminal liability by selling the products without proper labeling in violation of the Pure Food and Drug Act. *See* note 4, *supra*. Whatever might be Clairol's obligation to properly label a product which is intended for resale to the consumer public, the defendants themselves have advanced no excuse for their own complicity in placing these goods upon the consumer market under circumstances which represent both a danger to the consuming public and a constant exposure of Clairol to potential liability, both civil and criminal. We find not clearly erroneous the court's determination that:

> The professional product does not contain instructions that the product might cause allergic reactions. Use of the product without proper instructions can increase the danger of customer dissatisfaction with the results achieved. Exposure of the bottle to light causes deterioration of

8. We also are aware that we generally should defer to the district judge's construction of state law.

> [I]n the absence of any precise decisional law on the issue, we accord considerable weight . . . to the interpretation of the law of [a state] by a federal district judge located in that state who, therefore, would be possessed of a greater sensitivity to that State's interpretation of its own laws.
>
> *Martin v. University of Louisville, supra,* 541 F.2d [1171], at 1176 n. 7 and cases cited therein (6th Cir. 1976).

*Lenoir v. Porters Creek Watershed District,* 586 F.2d 1081, 1093 (6th Cir. 1978). *See also, e. g., Bishop v. Wood,* 426 U.S. 341, 346 & n. 10, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Martin v. University of Louisville, supra,* 541 F.2d 1171 (6th Cir. 1976); *Insurance Co. of North America v. Federated Mutual Insurance Co.,* 518 F.2d 101, 106 & n. 3 (6th Cir. 1975); *Rudd-Melikian, Inc. v. Merritt,* 282 F.2d 924, 929 (6th Cir. 1960).

the product, and may change the end color obtained. In addition, display of an uncartoned bottle injures Clairol's reputation, since the bare bottle detracts from the image of quality and reliability built up by a substantial advertising to the general public.

Thus, this Court concludes that the actions of the defendants constitute unfair competition, in that they tend to injure the reputation and good will established by Plaintiff Clairol, Inc.

191 U.S.P.Q at 642. We believe these essentially undisputed findings support the conclusion of the district court and are compatible with the Michigan law of unfair competition.[9]

In conclusion, therefore, we hold that the particular practice complained of here and clearly shown by the proof, i. e., the practice of the defendants in selling the salon product to the consumer under the name of Miss Clairol and without any accompanying instructions or precautions, necessarily constitutes an act of unfair competition which entitles Clairol to injunctive relief in the absence of some other appropriate and countervailing equitable consideration. The defendants claim that such an equitable consideration is present here, asserting that Clairol has come into court with "unclean hands." Defendants argue that Clairol has intentionally created the very situation of which it complains and has in the process violated the federal antitrust laws.

## III. THE SHERMAN ACT

### A. The *Colgate* doctrine

Much of the legal discussion which occupied the parties both in their argument

---

**9.** The nature of the particular fraud is best described in *Clairol, Inc. v. Sarann Co.,* 146 U.S.P.Q. 726 (Pa.Ct.C.P.1965). In fact, we find no essential differences between the facts there and those here and believe that the court's description of the nature of the unfair competition is particularly applicable:

Plaintiff [Clairol] is entitled to at least some protection. The evidence (and there was no defense offered) discloses that plaintiff tries to protect both its good will and the public, and tries to keep "Miss Clairol" safe and effective, by enclosing it in a carton, and by supplying adequate directions both for determining whether the user will have an allergic reaction and for the use of its product. But the manner by which defendant sells "Miss Clairol" demonstrates that defendant is unconcerned with whether plaintiff's product is safe or effective. Defendant somehow obtains the professional package of "Miss Clairol", and although it must be aware of the detrimental effects of its action is sells "Miss Clairol" to the retail trade in the naked bottle—without a protective carton, without instructions for use, and without adequate directions by which the consumer can give herself an allergy test. The net result is that the consumer who buys "Miss Clairol" in the naked bottle from defendant, although she may think she is purchasing the safe, effective product she associates with plaintiff, is not getting it. But the consumer will attribute any unsatisfactory performance from "Miss Clairol" to plaintiff, and not to defendant. Defendant thus uses plaintiff's goodwill to make sales, but acts in a manner which can only decrease plaintiff's goodwill, thus damaging an important property interest of plaintiff. It would seem, therefore, that plaintiff is entitled to protection from these acts of defendant.

Defendant resists this conclusion, urging that "the essence of unfair competition is either the imitation or the substitution of one manufacturer's goods for another." However, the law of unfair competition has not been so confined in Pennsylvania. Pennsylvania decisions containing language similar to defendant's statement of the law cannot be considered as limiting the doctrine of unfair competition to "passing off" . . ..

146 U.S.P.Q. at 730–31 (footnote omitted).

While Michigan law, especially in earlier cases, emphasized "actual competition" as a prerequisite in unfair competition cases, *Good Housekeeping Shop v. Smitter,* 254 Mich. 592, 236 N.W. 872, 873 (1931); *Burns v. Schotz,* 343 Mich. 153, 72 N.W.2d 149, 151 (1955), the parties do not dispute Judge Kaess's observation in his opinion:

Each defendant acknowledges that he has sold, and is continuing to sell, the salon product on the retail market *in competition with* Clairol's retail product. . . .

In any event, the Michigan Court of Appeals has noticed a tendency, however,

in recent years, for courts to pull back somewhat from the rigid requirement which insisted that in order to amount to an infringement, the parties had to be competitors. *Polaroid Corp. v. Polaroid Inc.,* 319 F.2d 830 (C.A.7, 1963); *Dunhill of London v. Kasser Distillers, d/b/a Dunhill Distillers,* 350 F.Supp. 1341 (E.D.Pa., 1972).

*Boron Oil Co. v. Callanan,* 50 Mich.App. 580, 213 N.W.2d 836, 838 (1973).

before the district court and in their briefs on appeal concerns whether Clairol's conduct fell outside the anti-trust laws pursuant to the Supreme Court's decision in *United States v. Colgate,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The district court held that under the *Colgate* doctrine Clairol's conduct did not violate Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976) which provides:

> Every *contract, combination* in the form of trust or otherwise, or *conspiracy* in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

(emphasis added). Construing this language, the Supreme Court in *Colgate* held that the Sherman Antitrust Act was not intended to extend to solely unilateral action by a vendor of goods:

> The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

250 U.S. at 307, 39 S.Ct. at 468.

The extent to which *Colgate* has been eroded is the subject of vigorous discussion by authorities, but all agree that it has substantially been narrowed by subsequent decisions of the Supreme Court, particularly *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)

and *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).[10] Thus, in *United States v. Parke, Davis & Co.,* Mr. Justice Brennan, speaking for a majority, held that Parke, Davis' conduct went well beyond a mere announced intention to refuse to deal by the manufacturer, and thus subjected the company to antitrust liability under Section 1 of the Sherman Act. The Court found that the manufacturer had enlisted the assistance of other customers in enforcing and monitoring its restrictive price structure through "affirmative action to achieve uniform adherence" on the part of retailers. 362 U.S. at 47, 80 S.Ct. at 513. In *Albrecht v. Herald Co., supra,* the Supreme Court, speaking through Mr. Justice White, held violative of Section 1 the efforts of a newspaper company to force maximum prices upon its distributors where it was shown that the newspaper engaged the services of another company to compete with the recalcitrant distributor. The court found that the newspaper's conduct was not wholly unilateral but was a combination between it and the other sales organization which the paper had engaged to compete.[11]

■ The defendants here point to certain undisputed evidence in the record, not expressly recognized by the trial judge but clearly before him, which indicates that under an expanded view of *Parke, Davis* and *Albrecht,* if not indeed within their express terms, Clairol had gone beyond the permissible limits of *Colgate* in enforcing its ban on resale of the salon product. Thus it was shown that Clairol wrote letters to each distributor and retailer threatening action if the undesired sales were continued. As in *Parke, Davis* Clairol also undertook other policing actions designed to restrict the resale of its product. The letter sent by Clairol to its distributors of the salon prod-

---

10. *See* L. Henken, *The Supreme Court, 1967 Term,* 82 Harv.L.Rev. 63, 258–60 (1968); L. Sullivan, *Law of Antitrust* § 39 (West 1977). *See also* D. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655 (1962).

11. Other major Supreme Court cases limiting the *Colgate* doctrine include *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944) and *FTC v. Beech-Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922).

uct at least arguably establishes that the relationship between Clairol and its customers and the restriction upon the resale was considered by Clairol to be a matter of agreement and thus, under Section 1 of the Sherman Act, a combination. While the letter's recital of Clairol's "firm policy" not to sell its salon product to "any customer who would resell it into retail trade channels" may be permissible under *Colgate,* as the defendants point out in their brief, the letter goes much further:

> Insofar as our "professional" products are concerned, however, it must be understood that they are sold to you only on Clairol's understanding that you do not intend or engage in reselling any of them except to [the professional trade] . . .
>
> We are quite serious in our policy, and your orders to us will be considered to be a representation of your intent and practice as described above.

We, therefore, agree with the defendants that Clairol's actions go beyond the simple refusal to sell and warning which might be protected by the *Colgate* doctrine. In short, if Clairol's case must hinge on its coming within the *Colgate* exception, it must perforce fail. The case, however, is not that simple.

## B. The *Per Se* Rule

At the time this litigation was commenced and tried before the district court, the simple act of restricting sales after one had parted with the title to the goods was conceived by many courts to amount to a *per se* violation of the Sherman Act. *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Without adding to the extensive commentary on the subject, suffice to say for our purposes here that any conception that a *per se* rule for such vertical non-price restraints of trade still exists was fully dispelled by *Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), which expressly

overruled *Schwinn.* In *Sylvania,* the Court re-examined its rationale for applying a *per se* rule in verticle, non-price situations, concluding that the Rule of Reason standard is to apply unless justification "based upon demonstrable economic effect" can be shown. The Court further observed that:

> When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act.

433 U.S. at 59, 97 S.Ct. at 2563.[12]

## C. Rule of Reason

Since a *per se* rule does not apply, the question remains whether the district judge erred in his alternative finding that the restriction which Clairol placed upon the resale of its salon product was permissible under the Rule of Reason. We agree with the district judge that the restraint here was reasonable. As the Supreme Court observed in *National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–92, 98 S.Ct. 1355, 1363, 1364–1365, 55 L.Ed.2d 637 (1978) (Stevens, J.) (footnotes omitted):

> One problem presented by the language of § 1 of the Sherman Act is that it cannot mean what it says. The statute says that "every" contract that restrains trade is unlawful. But, as Mr. Justice Brandeis perceptively noted, restraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law. Yet it is that body of law that establishes the enforceability of commercial agreements and enables competitive markets—indeed, a competitive economy—to function effectively.
>
> \*   \*   \*
>
> Congress, however, did not intend the text of the Sherman Act to delineate the full meaning of the statute or its applica-

---

**12.** The Supreme Court's continued adherence to the Rule of Reason is further evidenced in *Broadcast Music, Inc. v. Columbia Broadcast-* *ing System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

tion in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition. The Rule of Reason, with its origins in common-law precedents long antedating the Sherman Act, has served that purpose. It has been used to give the Act both flexibility and definition, and its central principal of antitrust analysis has remained constant. Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions.

\* \* \*

The test prescribed in *Standard Oil [Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed.2d 619 (1911)] is whether the challenged contracts or acts "were unreasonably restrictive of competitive conditions." Unreasonableness under that test could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices. Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.

\* \* \*

In this respect the Rule of Reason has remained faithful to its origins. From Mr. Justice Brandeis' opinion for the Court in *Chicago Board of Trade [v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683] to the Court opinion written by Mr. Justice Powell in *Continental T. V., Inc. [v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568] the Court has adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or

whether it is such as may suppress or even destroy competition." 246 U.S., at 238, 38 S.Ct. 242, quoted in 433 U.S., at 49 n. 15, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568.

\* \* \*

[T]he purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.

Examining the practice here in light of the broad principles of the Rule of Reason, particularly as outlined by Mr. Justice Stevens, we believe that Clairol's restriction fully meets the tests posed by that Rule. Our decision is based upon the very practical considerations which face Clairol and other manufacturers of goods for a particular market, such as the salon market here. We look at Section 1 as designed to promote freedom of trade and commerce, not to restrict it, although as pointed out by Mr. Justice Stewart, dissenting in *Albrecht, supra,* particular decisions at particular times may result in turning the statute on its head. 390 U.S. at 170, 88 S.Ct. 869.

In applying the Rule of Reason, we think it is first important to determine whether the manufacturer's conduct has a tendency to monopolize or stifle competition in the trade generally. Clearly Clairol's practice here does not. Clairol does not make any restriction upon the resale price of either its retail or wholesale products beyond the pure suggestion contained within the cost of the goods themselves. *Cf. Dr. Miles Medical Co. v John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) (holding vertical price fixing is a violation of § 1). Regardless of what might be permissible under *Colgate,* there is no showing that any distributor of Clairol's salon product was limited or restricted in the price it might charge for sale of the product to a proper purchaser thereof. Likewise there is no showing of any combination between Clairol and any other manufacturer of comparable products, i. e., a horizontal restric-

tion, wherein they have restricted or limited their production or set their pricing policies in combination with one another. Therefore, while there is a substantial difference between the price Clairol charges for its retail and its salon products, there is no showing that a competitor is not free to compete for a share of the market by such pricing structure as it might find desirable even to the extent that it might drive Clairol's products out of the market altogether.

We find nothing in the antitrust laws which compels a manufacturer to produce and to package products so that they are wholly suitable for a market in which it does not intend them to be used and where they are not suitable for public consumption in the form sold. This, in the final analysis, is precisely and only what the defendants ask here.

### IV. CONCLUSIONS

Defendants have relied upon the early Supreme Court decisions which point to the limited right of the use of a trademark and recognize that it is more limited generally than the rights gained from copyright law. See *Prestonettes, Inc., supra,* and *Champion Spark Plug Co., supra.*

It is true, of course, that resale restrictions cannot impede the right, for example, of a used car dealer to sell a used Ford or Chevrolet automobile in his used car lot by describing it for precisely what it is, a used car of that particular make and model. The defendants here, however, are not content with the normal exercise of such rights; what they wish is to compel Clairol to produce a product intended for wholesale distribution in a fashion which will make it suitable for retail use, and somehow to gain a competitive price advantage in the process. The simple answer is that Clairol already produces such a product, which the defendants are at liberty to buy and on which there are no resale restrictions. Further, this product fully complies which the Pure Food and Drug Administration requirements and provides the public with what it expects and has a right to expect from the use of the product by way of both protection of the contents and of information concerning its use.

We note that the injunction entered by the court, while broad, is carefully tailored to prohibit only that conduct which is found either detrimental to the public or harmful to the plaintiff's proper rights to the protection of its trademark and copyright and the goodwill attendant thereon.[13] Thus we

---

**13.** The district court's injunction states:

"1. Defendants Boston Discount Center of Berkley, Inc.; Bonnie Discount Stores, Inc.; Ace Cosmetic and Vitamin Discount Distributing Co., Inc.; Cherry Hill Drug Center, Inc.; American Vitamins & Cosmetics, Inc., Nor-Les Sales, Inc. and Lester Greenspan d/b/a American Discount, American Vitamin & Nor-Les Sales; Richard Ravid d/b/a Richard's Beauty Supply; and King Brighton, Inc., their officers, agents, servants and employees, and all persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, are hereby permanently enjoined from directly, or knowingly through or in concert with or in aid of others, causing or participating in the sale at retail to non-beauticians or selling at retail to non-beauticians or buying, stocking or displaying for any such offer or sale, any Miss Clairol Hair Color Bath manufactured or distributed by Clairol Incorporated and bearing any of its trademarks or trade names which:

(A) is not labeled in full accordance with the requirements of the Federal Food, Drug and Cosmetic Act for the proper and satisfactory use of such product by untrained, lay consumers; or

(B) does not bear adequate instructions, as furnished by Clairol Incorporated, for the proper and satisfactory use of such product by untrained, lay consumers; or

(C) is not enclosed in the original, single bottle carton in which each such product was placed by Clairol Incorporated for general sale to the public; or

(D) is not accompanied by the package insert placed by Clairol Incorporated in the carton for each said product for general sale to the public; or

(E) bears or did bear labeling (including bottle labels, package inserts and bottle cartons) placed thereon by Clairol Incorporated which has in any way been defaced, removed, altered, amended, replaced, substituted, or supplemented by persons other than Clairol Incorporated; or

(F) is not labeled in full accordance with the law applicable to the sale of each such product to members of the general, non-professional public.

note that the injunction does not bar the resale by the defendants of the dye itself, but on the contrary enjoins the selling at retail to non-beauticians of "any Miss Clairol Hair Color Bath manufactured or distributed by Clairol, Incorporated, and *bearing any of its trademarks or trade names . . . ."* While arguably the defendants might have claimed a right to a modification of the injunction similar to that in *Clairol, Inc. v. Cosmetics Plus,* 130 N.J.Super. 81, 325 A.2d 505 (1974), *and Clairol, Inc. v. Cody's Cosmetics, Inc.,* 353 Mass. 385, 231 N.E.2d 912 (1967), the truth is they have not sought that relief here. Instead defendants have insisted only that they have the right to continue to sell Clairol products on the consumer market in outright violation of the Pure Food and Drug laws, and that Clairol's only alternative is to furnish them with its copyrighted material and with labeling which contains appropriate cautionary language required by the Pure Food and Drug Act for retail products. This, we hold, Clairol is not obligated to do.

Accordingly, the judgment of the district court is affirmed.

2. All of the defenses herein asserted by each defendant are rejected with respect to liability.

    3. The counterclaims filed herein by each defendant shall be and hereby are dismissed with prejudice.

4. Jurisdiction is retained with respect to monetary relief."